IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 5, 2004 Session

## HERBERT F. PITZ AND SHIREL H. PITZ
v.
## DONALD E. WOODRUFF AND DOROTHY D. WOODRUFF

**An Appeal from the Chancery Court for Lincoln County**
**No. 11,595         J. B. Cox, Chancellor**

**No. M2003-01849-COA-R3-CV - Filed December 17, 2004**

This case involves claims of fraud arising out of the sale of a house. The plaintiff purchasers signed a contract to buy a house owned by the defendants. The contract to sell contained an "as is" clause, allowing inspection of the property but requiring the sale to be "as is." The purchasers did not inspect the house further before the closing. After the purchasers took possession, they noticed several defects in the house that were not disclosed by the sellers. The purchasers sued the sellers, alleging that the sellers had made material misrepresentations of fact and had fraudulently concealed or failed to disclose material defects in the house. After a bench trial, the trial court held in favor of the sellers. It concluded that, although the sellers had made material misrepresentations of fact, the purchasers' reliance on those representations was not reasonable because of the "as is" provision in the contract and because the defects were either apparent or readily discoverable. The purchasers now appeal. We affirm, finding that the evidence does not preponderate against the trial court's conclusion that the purchasers' reliance was not reasonable.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

T. Lance Carter, Fayetteville, Tennessee, for the appellants, Herbert F. Pitz and Shirel H. Pitz, individually and as trustees for the Herbert F. Pitz 1993 Revocable Trust and the Shirel H. Pitz 1993 Revocable Trust, respectively.

William E. Simms, Fayetteville, Tennessee, for the appellees, Donald E. Woodruff and Dorothy D. Woodruff.

## OPINION

Defendants/Appellees Donald E. Woodruff and his wife, Dorothy D. Woodruff (collectively, "the Woodruffs"), owned a 16.72-acre tract of land in Lincoln County, Tennessee. In 1988, they constructed a house on the property. They lived in the house for about twelve years. Ultimately, they decided to sell the property. On January 27, 2000, in contemplation of selling it, the Woodruffs completed a Tennessee Residential Property Condition Disclosure ("disclosure form") indicating that the house had no significant defects or malfunctions.[1]

On April 19, 2000, Plaintiffs/Appellants Herbert F. Pitz and his wife, Shirel H. Pitz (collectively, "the Pitzes"), visited the property for about two and a half hours. They became interested in buying it, and on April 20, 2000, the Pitzes again visited the property. This time, they spent four to five hours looking at the house. On or about April 30, 2000, the parties entered into a contract for the sale of the property.[2] The contract was on the standard form used by the realtor for the Pitzes and was prepared by the Pitzes' realtor. The contract contained the following provision, referred to as the "as is" clause:

> **11. PROPERTY INSPECTION.** BUYER may inspect the property, or BUYER may contact a qualified inspector of BUYER's choice at BUYER's expense to obtain any inspections of electrical and mechanical equipment, or for a structural inspection of the property. All such inspections shall be made during normal working hours after acceptance of this agreement, and a copy of any written inspection report shall be delivered to the SELLER'S AGENT within 10 days after acceptance of this Agreement. SELLER shall cause all utilities to be operational so that BUYER may complete such inspections. If BUYER does not deliver a written statement specifying any items shown in the inspection report which are unacceptable within 12 days after acceptance of this Agreement, the property shall be deemed acceptable to BUYER. If the inspection report reveals a material problem or problems affecting the structural soundness or mechanical/electrical equipment of the property, then either SELLER or BUYER may terminate this Agreement by delivering a written statement to the other party within 12 days after acceptance of this Agreement.
>
> **Buyer understands and agrees that by waiving the right to inspect the property, BUYER accepts the property "as is" without exception, excluding Item 10. BUYER understands and agrees that inspections required by FHA, VA, or BUYER'S lender do not necessarily eliminate the need for other inspections.**

---

[1]Section C on the disclosure form asks, "Are you (Seller) aware of any significant defects or malfunctions in any of the following?" Then it lists fifteen categories in which the seller can mark "yes," "no,"or "unknown." The Woodruffs marked "no" in each category.

[2]Though the contract was dated April 30, 2000, the parties actually signed the contract on May 13, 2000 (the Pitzes), and on May 26, 2000 (the Woodruffs).

All of the SELLER'S responsibility in connection with this paragraph shall cease at closing, and closing shall constitute the BUYER'S acceptance of the property, its mechanical equipment, and other improvements to the property in their existing condition (unless otherwise specified in writing). . . .

Thus, under the terms of the contract, the Pitzes were permitted to inspect the property or hire a professional inspector to inspect the property and submit to the Woodruffs a statement of any unacceptable items. If no such statement were submitted, the property would be "deemed acceptable" to the Pitzes, and the Pitzes would agree to accept the property "as is." On April 30, 2000, the Pitzes signed the Tennessee disclosure form that had been filled out by the Woodruffs, acknowledging that they had received it.

Though the Pitzes' real estate agent recommended that they retain a professional building inspector, they did not do so. Mr. Pitz was an employee of General Electric, where he was a grounds and buildings superintendent, taking care of all buildings, grounds, and roofs. Consequently, he had considerable building experience. Nevertheless, after the sales contract was executed, the Pitzes did not inspect the property again. On July 6, 2000, the day before closing, the Pitzes moved into the house, and spent their first night there. Mr. Pitz did not inspect the house the day they moved in. The closing was completed on July 7, 2000.[3]

After living in the house for some time, the Pitzes encountered a number of problems. Consequently, on April 6, 2001, the Pitzes filed the complaint in the trial court below, asserting claims against the Woodruffs for fraudulent misrepresentation, fraudulent non-disclosure of material defects, and fraudulent concealment of certain alleged defects.

The complaint detailed many of the claimed defects. Some of the allegations related to a brick porch that was added to the house by Mr. Woodruff without the assistance of a professional contractor. The brick porch was built just outside double doors in the master bedroom on the second floor (middle) of the house, just above a den referred to as a "rec room." The complaint alleged that water from the porch leaked into the rec room, causing damage to the room's walls and ceiling. Other allegations related to a wooden deck, also built by Mr. Woodruff, that was situated around the front of the house adjacent to the brick porch. The complaint alleged that the foundation of the deck was completely enclosed with no drainage, and that the build-up of water underneath the deck compromised the foundation of the house. The complaint also referred to a fence that lay across boundary of the neighbor's property ("fence issue"), defective furnace and air conditioning units ("furnace/air conditioning"), and permanent stains on six thermopane windows due to a leaky

---

[3]The deed to the property conveyed a one-half undivided interest to Herbert F. Pitz, Trustee under the Herbert F. Pitz 1993 Revocable Trust, and a one-half undivided interest to Shirel H. Pitz, Trustee under the Shirel H. Pitz 1993 Revocable Trust, as joint tenants with a right of survivorship. The conveyance to the trusts, rather than to the individual Pitzes, was not known to the Woodruffs until the date of closing. The involvement of the trusts in this transaction is not pertinent to the issues on appeal

heating element ("insulating element leak"). The Pitzes also alleged that they relied, to their detriment, on the Woodruffs' representations in the Tennessee disclosure form.[4]

A bench trial was held on February 20 and 22, 2003. In view of Mr. Pitz's expertise and building experience, he was qualified as an expert for trial and testified as both an expert and as a fact witness. He testified about the alleged defects on the property as well as the Woodruffs' representations regarding those defects. Mr. Pitz said that, on April 19, 2000, when he first visited the house, he saw no defects. On the second visit, he related, when he and Mrs. Pitz were downstairs in the rec room with Mr. Woodruff, he saw a small door that led to the space underneath the deck in the front of the house. It was a screen door, but a black piece of rubber material had been placed behind the screen blocking the view of the area under the door. Mr. Pitz testified that, when he asked Mr. Woodruff about what was behind the door, Mr. Woodruff discouraged him from looking under the door, telling him "it goes under the deck. . . . [T]here's nothing in there that would concern [you], there's no problems in there."

Mr. Pitz testified further that, as he and Mr. Woodruff were walking around the outside of the house, he asked Mr. Woodruff about a five-foot crack he saw in a brick wall that supported the foundation of the deck. Mr. Pitz said that Mr. Woodruff told him that the crack was the result of normal expansion and contraction or settling of the house. Mr. Pitz said that he accepted Mr. Woodruff's explanation.

Mr. Pitz testified that, after he and Mrs. Pitz had lived in the house for a short time, he became curious about what was behind the screen door that led underneath the deck. He said that he took a chisel, broke the screen, and removed a door in order to get access to the area. He discovered what he described as a big "swamp" under the deck. The water from the gutters on the house was channeled under the deck, in addition to the water that drained directly through the deck. All of the water collected under the deck because there was no drainage system going out. This lack of drainage, Mr. Pitz said, threatened the stability of the foundation of the house. Mr. Pitz stated that, from under the deck, he saw the other side of the cracked brick wall, and that the entire corner of the wall "was all just falling apart." He said that he could see other walls that also had cracks, and it seemed that the whole foundation was "giving away and causing that wall to crack, and part of it was even leaning out about an inch or so." To remedy the situation, Mr. Pitz said he had to install two four-inch drains. To do so, he paid a worker $300 to help him dig out the lower part of the foundation on the inside and break through the wall in two places under the deck. His own work on the drainage system, Mr. Pitz stated, was worth about $1,800, estimating that he spent about 120 hours working on it at a rate of $15 per hour.

During the Pitzes' April tour of the house, Mr. Pitz asserted, Mr. Woodruff showed him the carpeted, finished room in the basement and the nearby area where the furnace, two hot water heaters, and a central vacuum system were located. Behind a small door under the stairs going down

---

[4]On July 2, 2001, the Pitzes filed an amended complaint substituting the Herbert F. Pitz 1993 Revocable Trust and the Shirel H. Pitz 1993 Revocable Trust as plaintiffs in the complaint.

to the basement was a four-foot by five-foot sump with water in it.  Mr. Pitz said that he observed that the sump had in it a four-inch drain and another one-inch drain.  He said that  Mr. Woodruff explained to him that, after he installed a beaver board system (described as an indoor gutter) to facilitate draining, he had no problems with the sump drain.  Mr. Pitz testified that he could not crawl under the stairs easily, so he did not see how the area was draining.

The first rain after the Pitzes had moved into the house revealed further problems.  After the rain, it became apparent that there was, in fact, a problem with the sump drain because the carpet in the basement became wet.  Mr. Pitz said that the water overflowed from the sump, which indicated that the water was not properly draining from the sump.  Mr. Pitz observed that, when he and his wife had toured the house, neither of them had seen a dehumidifier in the basement.  Two days after closing, however, the Woodruffs told the Pitzes that they would need a large dehumidifier for the basement, and offered to lend the Pitzes their dehumidifier until they could get one for themselves. The Pitzes maintained that this showed that the Woodruffs knew that there was a water problem in the basement.  Mr. Pitz said that he paid $350 to Kenneth Edwards ("Edwards"), who had ten years of backhoe experience, to help him unclog the sump drain.  Edwards testified at trial that the four-inch pipe in the sump did not go outside the house, that the concrete had it sealed off, and that the one-inch pipe was not functioning because it was clogged with mud.  Mr. Pitz testified that remedying the sump problem required him to take twenty hours or two days to break through the foundation and install a new drainage line.  Mr. Pitz estimated that his own services in fixing the sump problem were valued at $300 (20 hours at $15 per hour).

Mr. Pitz testified that the first rain revealed another water problem.  Rain leaked from the bedroom doors leading to the brick porch down onto the floor of the rec room.  The leak resulted from the fact that the doors had no flashing around them to keep water from seeping down.  Mr. Pitz asserted that the Woodruffs had concealed the problem by painting over water stains on the ceiling of the rec room prior to the closing.

In his deposition, Mr. Woodruff said that he had had trouble with this same leak for several years after the deck was built in either 1990 or 1991.  He acknowledged that the moisture from the leak caused part of the sheetrock tape in the wall of the rec room to pull loose and left a stain by the tape.  However, he characterized the leak as minor, and said that it did not cause any permanent damage to the house.  Mr. Woodruff claimed that, in 1997, he fixed the leak by putting a new layer of polymeric matting over the threshold of the doors and running it up walls of the master bedroom about seven inches.[5]  He asserted that these measures fixed the problem, and consequently he did not mentioned it to the Pitzes.  Mr. Woodruff conceded that he painted over the stain before closing, but explained that he did  that so the Pitzes would have "an aesthetic, pleasing entrance to the house and not have to do any extra work on the house."

---

[5]In his deposition, Mr. Woodruff claimed that he fixed the leak in 1999.  At trial, however, he claimed that he fixed the leak three years before the sale of the house in 2000, which would indicate that the repair was made in 1997. Mrs. Woodruff testified in her deposition that the repair was made two or three years before the house was put on the market.  In any event, this disputed fact is immaterial to the issues on appeal.

Mr. Pitz tried to fix the leak from the bedroom doors by caulking the threshold, with no success. He contacted Scotty Wallace, a contractor, who estimated that it would cost $40,000 to fix the leak. Wallace suggested that a more cost-effective solution would be to put a roof over the top of the brick porch and screen it in. The Pitzes took this suggestion and hired Darrell Pragel to help Mr. Pitz build the roof over the porch and screen it in, for which they paid approximately $8,450 in labor and $7,267 in materials. Mr. Pitz stated that he spent about 160 hours on the project, and he valued his services at $2,400 (160 hours at $15 per hour).

Pitz also testified about a problem with the house's thermopane doors. He said that, on one of the days he was at the house in April, he ate lunch on the second floor near four of the thermopane doors. The windows in the doors appeared dirty. Mr. Pitz said that, about a week and a half after they took possession of the house, they tried unsuccessfully to clean the windows on the thermopane doors. They later determined that the windows could not be cleaned because the insulating element in the windows had leaked out and moisture had condensed on the inside of the windows. In Mrs. Woodruff's deposition, she acknowledged that the windows began to "fog up" about three or four years prior to the sale. When asked whether she disclosed this fact to the Pitzes, Mrs. Woodruff replied, "I didn't think it was necessary. It was quite obvious. There were no drapes, no curtains." A total of six thermopane windows in the house were replaced at a cost of $975.

Mr. Pitz also testified that the first time he tried to use the furnace, it did not work. Ultimately, he said, the entire unit had to be replaced at a cost of $3,400.

Finally, Mr. Pitz testified that, two days before the closing, Mr. Woodruff called him and told him that part of a fence running along the property was actually on the neighbor's property, and offered to later help Mr. Pitz move the fence. Mr. Pitz said that Mr. Woodruff did not help move the fence, however, and Mr. Pitz paid a worker $600 to help him move the fence and paid $341 for materials to complete the job.

Mr. Woodruff also testified at trial. He acknowledged that there had been some water problems with the house, but maintained that he had corrected those problems. Mr. Woodruff said he was aware of the leak in the doors of the master bedroom that led outside to the brick porch, but asserted that he fixed it by putting polymeric matting over the threshold of the door. He admitted that the leak had caused stains on the ceiling in the rec room, and that he painted the stains immediately before closing. He claimed, however, that he painted the area only for aesthetic purposes.

Mr. Woodruff testified that he had never had a problem with the sump water overflowing and flooding the carpet in the basement. He maintained that the beaver board system that he built drained the water, and then directed the water from the sump to the outside of the house.

With respect to the damage caused by the lack of drainage under the deck, Mr. Woodruff admitted that the water from the gutters was channeled underneath the deck, and although the deck

was completely enclosed, it had no drainage system underneath it. He said he had never been under the deck, and therefore had no knowledge of any problems from the collection of water in that area.

Mr. Woodruff claimed no knowledge of any defects in the furnace and air conditioning units. He said that the furnace and air conditioning units were twelve years old, and that they had been inspected regularly and were working properly when the house was sold. As for the thermopane doors, Mr. Woodruff testified that he and Mrs. Woodruff knew the windows were fogged. It was unclear whether either of them were aware of any insulating element leak that could have affected the windows in the doors. Mr. Woodruff noted that he and the Pitzes had lunch near the doors, and that the fogged windows were in plain view.

With respect to the fence issue, Mr. Woodruff stated that he assumed that Mr. Pitz would try to "straighten out" the problem with the neighbor. If that did not work, Mr. Woodruff stated, he was prepared to help Mr. Pitz move the fence. However, after the closing, Mr. Woodruff was never contacted by Mr. Pitz regarding the fence.

Mrs. Woodruff corroborated much of Mr. Woodruff's testimony. She said that, when the house was built, they experienced some slight leaking in the rec room when it rained, but characterized it as "only a trickle, it was not a drip or a leak." She denied that the leak ever caused "damage" to the ceiling of the rec room, but acknowledged that it resulted in "[a] normal small water stain" where the water came down. Mrs. Woodruff said that Mr. Woodruff painted over the small stain, just as he did every other imperfection in the walls, in order to leave the house "nice and clean" for the Pitzes to move in. She said it was not a conscious attempt to hide anything. She did not feel that it was necessary to disclose to the Pitzes the leak, the fogged thermopane windows, or any other obvious problems.

Additional witnesses were called to testify to corroborate Mr. Pitz's and the Woodruffs' version of the facts. Other witnesses testified with respect to damages. At the conclusion of the trial, the trial court took the case under advisement.

On June 30, 2003, the trial court issued a memorandum opinion finding in favor of the Woodruffs. The trial court noted at the outset that the Pitzes were bound by the sales contract that governed the transaction up to the closing. As an initial matter, the trial court determined that the disclosure form in and of itself did not impose liability on the Woodruffs, because Tennessee Code Annotated § 66-5-201, *et seq.*, disallows a suit based on the representations in the disclosure form alone, and the disclosure form is not a warranty. Next, the trial court concluded that the Woodruffs had made some misrepresentations of fact. The trial court found:

> [I]t is clear that some false representations were made. The representations concerning the thermo pane windows is the best example[.] The representation that the defendants would help in the moving of the fence is another. The discouragement of the plaintiffs going behind the screen under the deck to keep from getting dirty could be seen as another effort to hide a potential problem.

The representation concerning the windows was made knowingly. The defendants knew the thermo pane windows were fogged up. The defendants knew they had previous water problems and they agreed to help move the fence. The defendants knew that the deck foundation wall offered no outlet, even though they had no problems with drainage.

It went on to hold, however, that the Pitzes' reliance on the representations of the Woodruffs was not reasonable. The trial court reasoned:

The overarching question is whether the plaintiffs reasonably relied on the representations of the defendants. These representations clearly preceded the contract signing. How could the plaintiffs believe that they were entitled to rely on the representations in light of the contract language? The language of the contract placed them on notice that they should not rely on the representations of the sellers and that they were buying the property "as is." In light of the contract language it is not reasonable to rely on the representations of the sellers. Therefore the fraud claim must fail.

***

The testimony of those to be bound by the real estate contract was taken at trial. Neither of the plaintiffs appeared to be under any disability that would prevent them from reasonably understanding the import of the provisions of the contract they were signing which gave them the right to have the property inspected. The plaintiffs knowingly waived that right by not having an inspection performed. Further, given the expertise of Mr. Pitz, the defects complained of should have reasonably revealed themselves and caused him not to close on the house until those areas of concern were addressed. The plaintiffs had free reign [sic] and possession of the property and an ample opportunity to inspect the property prior to closing.

Thus, the trial court based its decision first on the "as is" provision in the contract. It also based its decision on its conclusion that the Pitzes should have been aware of the alleged defects in light of Mr. Pitz's expertise and their "free rein and possession of the property and . . . ample opportunity to inspect the property prior to closing."[6] Thus, the trial court concluded that there was no actionable fraud. Consequently, it held that the contract merged into the deed, and that no conditions or further warranties were made in the deed. On July 11, 2003, the trial court entered an order consistent with

[6]In dicta, the trial court surmised that, if the "as is" language had not been made a part of the contract, "it is clear that damages occurred as a result of the representations." The trial court opined that the cost of moving the fence, the cost of replacing the thermopane windows, and the cost of putting drainage holes in the foundation of the deck would have been appropriate damages.

the memorandum opinion dismissing the action against the Woodruffs. From this order, the Pitzes now appeal.

On appeal, the Pitzes argue that the trial court erred in finding that their reliance on the Woodruffs' representations was not reasonable. They assert that the trial court misapplied the law to the facts of the case, because the "as is" clause in the contract does not prevent them from recovering damages for material defects in the house when the defects were known to the Woodruffs. The "as is" language, they argue, allocates to the buyers only the risk of *unknown* defects. They maintain that the contract did not merge into the deed because the Woodruffs committed fraud.

Because this case was tried by the trial court without a jury, the trial court's findings of fact are reviewed *de novo* on the record, with a presumption that those findings are correct, unless the evidence preponderates otherwise. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993); Tenn. R. App. P. 13(d). The trial court's conclusions of law are reviewed *de novo*, with no presumption of correctness. *See State v. Levandowski*, 955 S.W.2d 603, 604 (Tenn. 1997). "Our *de novo* review is tempered by the well-established rule that the trial court is in the best position to assess the credibility of the witnesses; accordingly, such credibility determinations are entitled to great weight on appeal." *Murvin v. Cofer*, 968 S.W.2d 304, 306 (Tenn. Ct. App. 1997).

In order to prove a claim based on fraudulent misrepresentation, the plaintiff must prove that: (1) the defendant made a representation of an existing or past fact; (2) the representation was false when made; (3) the representation related to a material fact; (4) the false representation was made either knowingly or without belief in its truth or recklessly; (5) the plaintiff reasonably relied on the misrepresented material facts; and (6) the plaintiff suffered damage as a result of the misrepresentation. *Metropolitan Gov't of Nashville and Davidson County v. McKinney*, 852 S.W.2d 233, 237 (Tenn. Ct. App. 1992); *see Anderson v. Warren*, W2000-02649-COA-R3-CV, 2001 WL 1683810, at *3 (Tenn. Ct. App. Dec. 12, 2001). In such an action, the burden is upon the plaintiff to show that his reliance on the defendant's representation was reasonable. *Metropolitan Gov't of Nashville & Davidson County*, 852 S.W.2d at 237.

A party may be held liable for concealing or failing to disclose a material fact to the same extent that the party may be held liable for intentional misrepresentation. *See Patel v. Bayliff*, 121 S.W.3d 347, 352-53 (Tenn. Ct. App. 2003). To establish a claim based on fraudulent concealment or fraudulent non-disclosure, the plaintiff must show that (1) the defendant had knowledge of a material existing fact or condition, and that (2) the defendant had a duty to disclose the fact or condition. *Lonning v. Jim Walter Homes, Inc.*, 725 S.W.2d 682, 685 (Tenn. Ct. App. 1986). In the sale of real property, a fact or condition is "material" if it is one of "controlling importance in determining the desirability and value of th[e] residence." *Patel*, 121 S.W.3d at 353 (quoting *Simmons*, 206 S.W.2d at 296). The defendant has a duty to disclose such a fact or condition "unless ordinary diligence would have revealed the undisclosed fact." *Lonning*, 725 S.W.2d at 685 (citing *Simmons v. Evans*, 206 S.W.2d 295, 296 (Tenn. 1947)). Thus, there is no duty to disclose a material fact or condition if it was apparent through "common observation" or if it would have been

discoverable through the exercise of ordinary diligence. **Simmons**, 206 S.W.2d at 297; **Patel**, 121 S.W.3d at 353.

In outlining its decision, the trial court below did not distinguish between the Pitzes' claims based on fraudulent misrepresentation and those based on fraudulent concealment or non-disclosure. The trial court instead based its decision on its finding that the Pitzes' reliance on the Woodruffs' representations was not reasonable. On appeal, the Pitzes argue that the trial court erred in basing its conclusion on the "as is" language in the contract, because an "as is" clause applies only to *unknown* defects, not defects that were known to the seller at the time of the sale.

In support of their position, the Pitzes cite **Edmondson v. Coates**, No. 01-A-01-9109-CH000324, 1992 WL 108717 (Tenn. Ct. App. May 22, 1992). In **Edmondson**, the plaintiff purchasers signed a contract to purchase a home from the defendant sellers after seeing the house once. The sales contract included a provision stating that the purchasers agreed to take the property "as is" and allowed the purchasers to inspect the property and to obtain an independent opinion on the property prior to closing. **Edmondson**, 1992 WL 108717, at *1. The purchasers closed on the property and moved in without having made any further inspection. Several months after they moved in, the purchasers discovered several defects in the house that the sellers had not disclosed.[7] *Id.* at *2. One of the chimneys was pulling away from the house, and the sellers had covered the resulting gaps with caulking. Cracks in the foundation walls had been painted over. A leak around a shower on the first floor had resulted in rotten floorboards. The floorboards would have been visible from the basement, but the sellers had covered the underside of the first floor with insulation. *Id.* During their visit to the property, the purchasers had noticed water damage and had asked the real estate agent whether the roof had been leaking. The agent told them that the leak had been fixed. The leak had in fact not been fixed, and after the first rain, the leak caused substantial damage. The purchasers also alleged that the real estate agent told them that a pot-bellied stove in the kitchen could heat the whole house, when in fact the stove was strictly decorative and had never been connected to the chimney. Finally, after the purchasers took possession, a rotten window frame that had been painted over fell out, revealing other concealed rotten wood. *Id.*.

The purchasers sued the defendant sellers for fraudulent concealment of significant defects in the structure of the house.[8] The trial court granted summary judgment in favor of the defendant

---

[7]The purchasers also claimed that material representations had been made regarding the flooding of a creek located on the back of the property. The court's discussion regarding the "as is" clause, however, related only to the purchasers' claims of fraudulent concealment and non-disclosure of defects in the house. **Edmondson**, 1992 WL 108717, at *10-*11.

[8]The lawsuit also named the real estate agent, her affiliate agency, and the homeowner/agent's real estate agency as defendants. **Edmondson**, 1992 WL 108717, at *1-*2. However, issues related to the other defendants are not relevant to this appeal.

sellers, dismissing all claims against them.[9]  On appeal, the sellers argued that the "as is" language in the contract protected them by assigning to the purchasers the risk of any and all defects.  *Id.* at *10.  The appellate court disagreed, stating that the "as is" clause in the contract protected the seller from liability for *unknown* defects, but not from the liability for defects about which the seller knew. The appellate court reasoned:

> Although the courts will enforce "as is" clauses allocating the risk of *unknown* defects to the buyers, to do so where the sellers knew about the defects and withheld material information would be to blindly enforce a contract obtained by fraud. Justice would be poorly served if that were the law in Tennessee.  Happily it is not. Rather, the law is as follows:
>
>> [E]ach party to a contract is bound to disclose to the other party all he may know respecting the subject matter materially affecting a correct view of it, unless common observation would have furnished the information.
>
> *Simmons v. Evans*, 185 Tenn. 282, 285-86, 206 S.W.2d 295, 296 (1947) (quoting *Perkins v. McGavock*, 3 Tenn. 415, 417 (1813)); *Lonning v. Jim Walter Homes*, 725 S.W.2d 682 (Tenn. App. 1986).

*Id.* at *11.  Therefore, *Edmondson* makes it clear that, despite the existence of an "as is" clause in the sales contract, the seller is nevertheless obligated to disclose any known material defects in the condition of the house, provided the defects are not apparent or readily discoverable through the exercise of ordinary diligence.  *See Godwin Aircraft, Inc. v. Houston*, 851 S.W.2d 816, 822 (Tenn. Ct. App. 1992) (concluding that "as is" disclaimer in the sales contract was not a defense to a claim based on fraudulent misrepresentation regarding the condition of the aircraft).

In the instant case, the trial court found that the Pitzes' reliance on the Woodruffs' misrepresentations was not reasonable, in part because of the "as is" language in the sales contract. We must note that in *Edmondson*, the trial court had granted summary judgment to the buyer based on the "as is" contractual provision.  *Edmondson* says only that an "as is" provision in a contract is not a shield where the seller knew of a defect and withheld the information from the buyer.  It does *not* say that the "as is" provision cannot be considered *at all* in determining whether the buyer's reliance on the seller's representation was reasonable.

The trial court's decision in this case was not based solely on the "as is" clause in the sales contract.  The trial court also found that the defects about which the Pitzes complained were readily discoverable.  The trial court observed that, in light of Mr. Pitz's qualification as a building expert,

---

[9]The trial court bifurcated the case for trial, dealing with the claims related to flooding in one proceeding, and dealing with the claims for fraudulent concealment of the defects in a separate proceeding.  *Edmondson*, 1992 WL 108717, at *2.

"the defects complained of should have reasonably revealed themselves and caused [Mr. Pitz] not to close on the house until those areas of concern were addressed. The plaintiffs had free rein and possession of the property and an ample opportunity to inspect the property prior to closing." In addition, the trial court made the following specific findings:

12. Defendant Mr. Woodruff discouraged active inspection of the area under the deck at the initial inspection but did not discourage any active inspection prior to the closing during the time of possession by the plaintiffs.

13. Plaintiffs stayed overnight at the residence prior to closing and were not hindered in their opportunity to inspect the property.

\*\*\*

15. Defendants painted the recreational room in anticipation of closing.

16. Assertions made on the real estate disclosure form as to the thermo pane windows and as to the deck foundation wall were false but were easily discoverable by the plaintiffs.

These additional factual findings provide further support for the trial court's conclusion that the Pitzes' reliance on the Woodruffs' representations was not reasonable.

Whether a party's reliance on a misrepresentation was reasonable is a question of fact. *J. C. Bradford & Co. v. Southern Realty Partners*, W1999-01617-COA-R3-CV, 2000 WL 34411153, at \*10 (Tenn. Ct. App. Aug. 14, 2000). To determine the reasonableness of a plaintiff's reliance on a misrepresentation, we consider: (1) the plaintiff's business expertise and sophistication; (2) the existence of a longstanding business or personal relationship between the parties; (3) the availability of the relevant information; (4) the existence of a fiduciary relationship; (5) the concealment of the fraud; (6) the opportunity to discover the fraud; (7) which party initiated the transaction; and (8) the specificity of the misrepresentation. *Id.* Therefore, based on those factors, we must determine whether the evidence submitted at trial preponderates against the trial court's conclusion that the Pitzes' reliance was unreasonable.

First, we note that the trial court in this case concluded that the Woodruffs made misrepresentations of fact with respect to the thermopane windows, the fence issue, the damage caused by the lack of drainage under the porch, and other "previous water problems" that we interpret to mean the leak from the bedroom doors to the rec room and the overflowing of the sump into the basement room. The trial court observed that the Pitzes had "free rein" and "ample opportunity" to inspect the property prior to closing, and that in light of Mr. Pitz's undisputed expertise, the defects "should have reasonably revealed themselves."

-12-

On the issue of the fence, we must conclude that the evidence does not support the trial court's finding that a misrepresentation of fact was made. To the contrary, the undisputed evidence was that, prior to the closing, Mr. Woodruff told Mr. Pitz that the fence was on the neighbor's property. Mr. Woodruff's offer to help move the fence cannot be deemed a misrepresentation since, at best, it was clearly a promise to act in the future. Fraud based on a promise of future action without intent to perform is promissory fraud, and the Pitzes have articulated no such claim with respect to the fence. *Shahrdar v. Global Housing, Inc.*, 983 S.W.2d 230, 237 (Tenn. Ct. App. 1998). In addition, the evidence is undisputed that, after taking possession, Mr. Pitz never asked for Mr. Woodruff's assistance on this matter. Therefore, this claim is without merit.

On the remaining issues, the evidence is undisputed that the Pitzes spent several hours on the property during the April tour, and that Mr. Pitz actually saw the fog on the thermopane windows, observed the lack of drainage under the porch, and saw water in the sump under the stairs in the basement. The Pitzes alleged that the Woodruffs painted over the water stain on the ceiling of the rec room in order hide the leak from the bedroom doors. The trial court, however, found only that the Woodruffs had painted the stain "in anticipation of closing," but did not find that they had attempted to conceal a material defect. Mr. Pitz was qualified as a building expert at trial, and he was shown all of these areas of the house during his April tour and given unfettered opportunity to inspect prior to closing. Under all of these circumstances, including the existence of the "as is" provision, we cannot conclude that the evidence preponderates against the trial court's conclusion that the Pitzes' reliance on the Woodruffs' misrepresentations was unreasonable.

This finding also precludes any recovery based on misrepresentations made in the disclosure form,[10] as well as separate claims based on fraudulent concealment and fraudulent nondisclosure.

The decision of the trial court is affirmed. Costs on appeal are to be taxed to Appellants Herbert F. Pitz and Shirel H. Pitz, and their surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE

---

[10]The trial court indicated that the "warranty" language in section 66-5-201 disallows a lawsuit based solely on misrepresentations in the disclosure form. In light of our decision, we need not decide whether the trial court was correct on that point.