The METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, Plaintiff-Appellee,

v.

James R. McKINNEY, Bobby D. Davis, McKinney & Davis, a Tennessee Partnership, Defendants-Appellants.

Court of Appeals of Tennessee, Middle Section, at Nashville.

Sept. 4, 1992.

Application for Permission to Appeal Denied by Supreme Court April 12, 1993.

Patricia J. Cottrell, Director of Law, James L. Charles, Deputy Director of Law, James L. Murphy, III, Metropolitan Atty., Nashville, for plaintiff-appellee.

Jay S. Bowen, Steven E. Anderson, Bass, Berry & Sims, Nashville, for defendants-appellants.

## OPINION

LEWIS, Judge.

Defendants, James R. McKinney, Bobby D. Davis, and McKinney & Davis, a Tennessee partnership, have appealed from the trial court's judgment awarding plaintiff, The Metropolitan Government of Nashville and Davidson County (Metro), the sum of $38,000.00, after finding that defendant James McKinney had made fraudulent misrepresentations regarding the amount of attorney's fees that Metro had paid defendants for legal services in connection with the issuance of industrial revenue bonds.

The facts out of which this controversy arose are as follows:

In the early 1980's Metro initiated plans to construct a hotel and convention center complex in Downtown Nashville. Metro selected Nashville Hotel Properties, Limited (NHP) as the developer of the project. NHP was composed of six limited partnerships, and the Franklin L. Haney Company (Haney) of Chattanooga was the initial managing and general partner of NHP. The six separate partnerships comprising NHP were established to permit each partnership to receive up to $10,000,000.00 of industrial revenue bonds.

The construction of the hotel was funded in part by a federal Urban Development Action Grant (UDAG) which had been obtained by Metro. The UDAG was to be utilized to provide partial public financing for private investments so as to make the project financially feasible. The UDAG funds were used to reimburse the private developer after the developer had expended private funds for the development of the project. Metro designated the Metropolitan Development and Housing Agency (MDHA) as the agency responsible for the administration of the UDAG.

Additional funding for the hotel was obtained by NHP from industrial revenue bonds issued by the Industrial Development Board of the Metropolitan Government of Nashville and Davidson County (IDB). The defendants entered into a contract to serve as legal counsel for the IDB on the bond issues to NHP. Defendants were responsible for reviewing all documents and issuing legal opinions regarding the bonds issued by the IDB for NHP.

The industrial revenue bonds issued by the IDB on behalf of NHP were issued in two stages. In 1983, before the financial arrangements for the hotel had been completed by NHP, the IDB issued a total of $37,000,000.00 in industrial revenue bonds to the six partnerships comprising NHP in order to avoid the sunset provisions of the federal tax laws. These bonds were denominated the Series 1983A bonds and the closing for these bonds was held in New York City on 31 December 1983. At the closing, the defendants submitted their le-

gal opinions on each of the six bond issues to NHP.

In the loan agreements between NHP and the IDB, NHP agreed to be responsible for the payments of defendants' legal fees in connection with the six series 1983A bond issues.

William J. Hart, a partner in McKinney & Davis, attended the closing of the Series 1983A bond issuance in New York on 31 December 1983 and presented the firm's legal opinion letter and billing statements for the services rendered by the firm. Defendants charged a total fee of $92,500.00 which was apportioned among the six limited partnerships.

On 4 January 1984, Union Planters National Bank, which served as Trustee for the bond issuance, paid $35,000.00 of defendants' legal fees. In July 1984, Haney paid McKinney & Davis the sum of $57,500.00, the remaining portion of the fee.

The Series 1983A bonds were purchased by J.C. Bradford & Company, and the proceeds were invested by Union Planters National Bank, the Trustee. The bonds were not sold to the public during 1984 because the Amsterdam Rotterdam Bank N.V., New York branch, withdrew the letter of credit it had issued to the Trustee. In order to keep the hotel/convention center project alive during 1984, representatives of NHP sought a number of amendments and extensions to the loan agreements and indentures of trust which had authorized the issuance of the Series 1983A bonds. They made numerous appearances before the IDB seeking amendments and extensions and, each time, the defendants were required to be present to advise the IDB as to the propriety of the developers' request.

Later in 1984 Lloyd's Bank International, Limited (Lloyds Bank) agreed to issue a letter of credit to guarantee the Series 1983A bonds. It was therefore determined that the Series 1983A bonds could finally be marketed to the public. The developer also decided that new funds were needed to complete the project. After much negotiation, two separate but simultaneous transactions occurred on 31 December 1984 with respect to the financing for the hotel/convention center project.

First, the $37,000.000.00 Series 1983A bonds were remarketed so that they could be sold to the public by J.C. Bradford & Company. The remarketing of the Series 1983A bonds was essentially a restructuring of the entire bond issue with new terms; and secondly, $17.6 million in new bonds were issued to cover additional costs which had arisen in the hotel/convention center project. The IDB authorized a total of not more than $23 million in new bonds to be issued. However, only $17.6 million in new bonds were issued.

In order to accomplish both of these transactions, the IDB and Union Planters National Bank, as Trustee, executed an amended restated and supplemental Indenture of Trust, dated 1 December 1984. The defendants reviewed and worked on the amended restated and supplemental Indenture of Trust and advised the IDB on its validity. Without the execution of the amended restated and supplemental Indenture of Trust, the Series 1983A bonds could not have been remarketed and sold to the public and the new Series 1984A bonds could not have been issued. Defendants performed legal services for the IDB in connection with the remarketing of the Series 1983A bonds and the issuance of the Series 1984A bonds, including providing a legal opinion on behalf of the IDB which was necessary to the closing of the transaction. In accordance with their usual practice of charging $2,500.00 per million for bond transactions, the defendants' charge for the services was $136,500.00, $44,000.00 for the new money of $17.6 million and $92,500.00 for the remarketing of the $37 million in bonds.

The closing of the Series 1983A remarketing and the Series 1984A new bonds occurred on 31 December 1984 in New York. Neither defendants McKinney nor Davis were able to attend the closing because defendant McKinney was recovering from a heart attack and defendant Davis had to attend several other closings. Therefore, defendant Davis gave defendants' legal opinion to Mr. Murray Hatcher of J.C.

Bradford & Company with instructions that the opinion not be released until a check had been issued to pay defendants' legal fees for the services they had performed. Defendant Davis also sent billing statements to the closing in the amount of $92,500.00 for the services the firm performed on the Series 1983A remarketing and $44,000.00 for the services on the Series 1984A new issue.

At the closing, however, plaintiff authorized the defendants' legal opinion letter to be released without consulting defendant Davis. Defendants' legal fees were not paid at the closing. The fees were deferred at the instruction of the then Metropolitan Mayor, Richard Fulton, who attended the closing, along with Mr. Charles Cardwell, the Director of Finance for Metro. Some, but not all, of the lawyers present agreed to defer a portion of their legal fees. The fees of other law firms, including Butler and Binion, bond counselor for the developer, were paid in full at the closing.

Sometime after the closing, defendant McKinney received a telephone call from the then Mayor Richard Fulton who told defendant McKinney that he had deferred defendants' fees at the closing, but assured defendant McKinney that defendants' legal fees would be paid by Metro. The defendants relied on Mayor Fulton's representation to refrain from bringing a lawsuit to collect their legal fees.

In March 1986, Haney proposed the construction of an apartment house to be located in Downtown Nashville, and was seeking approval from the IDB for the issuance of bonds and a commitment from J.C. Bradford & Company to purchase those bonds. As a part of his efforts to obtain financing for this development, Franklin Haney requested that defendants agree to assign any interest they might have in the hotel/convention center project.

In exchange for Haney's agreement to pay $47,000.00 to defendants, defendant Davis agreed to execute an assignment to assign "any and all interests which [defendants] presently have in the project" to Haney. At Haney's request, defendant

Davis wrote a letter to Murray Hatcher confirming the receipt of these funds and stating that Haney did not owe them anything further. Neither the assignment nor defendant Davis' letter stated that the acceptance of the $47,000.00 satisfied the obligation of Metro to insure that the remainder of the fees owed to defendants for legal services on the hotel/convention center project would be paid.

In early 1987, McKinney learned that the deferred fees of other attorneys who had performed services in connection with the project had been paid. This prompted defendant McKinney to call Mayor Fulton to inquire about when the remainder of defendants' fees from the December 1984 closings would be paid. Mayor Fulton then contacted Gerald Nicely, Executive Director of MDHA, and advised him of his action in deferring the fees at the closing and directed Mr. Nicely to look into why defendants' fees had not been paid.

Mr. Nicely began to inquire about the payment of the fees and some months later, in September 1987, then Mayor Bill Boner called Nicely and again directed him to look into the situation. Prior to making payment, Mr. Nicely was told by Irene Krauland, a representative of Lloyds Bank, and Ted Welch, a representative of the NHP partnerships, that they believed defendants had been paid at least some amount for their services.

In early 1988, Mr. Nicely called defendant McKinney and advised him that he had investigated the matter and had concluded, after consulting with legal counsel, that MDHA had $38,000.00 left from the UDAG funds to be used for expenses for the Project and that he could pay that amount for defendants' services.

Although defendant McKinney believed the defendants were still owed $85,000.00 for services performed in 1984, defendant McKinney agreed to forego asserting those claims against Metro and to accept the $38,000.00 in satisfaction of the debt in order to resolve the matter. Mr. Nicely sent defendant McKinney an affidavit, drafted by MDHA attorney George Barrett, stating that "McKinney & Davis have

not received payment for the services invoiced." McKinney signed the affidavit and, at Nicely's request, McKinney asked defendant Davis to prepare billing statements apportioning the $38,000.00 in legal fees among the six partnerships.

On 5 May 1988, Irene Krauland of Lloyds Bank wrote Mr. Nicely indicating that defendants had already been paid $47,-000.00. Mr. Nicely turned this information over to Mr. Barrett, who requested an explanation from defendant McKinney by letter dated 10 May 1988. Metro requested that the defendants refund the $38,000.00, and defendants refused to do so.

On 2 June 1989, Metro filed suit against defendants and alleged that defendants had been overpaid for legal services performed for the IDB. Plaintiff specifically alleged as grounds for recovery that defendants had converted $38,000.00 paid to them by Metro and that defendant McKinney had made fraudulent misrepresentations to Metro.

Following a two-day trial without the intervention of a jury, the trial court found that defendant McKinney had made a fraudulent misrepresentation to Metro and that Metro had suffered a loss in the amount of $38,000.00 plus pre-judgment interest since October 15, 1988. On 3 September 1991, the court entered judgment in favor of Metro, and this appeal followed.

Defendants' first issue is: "Whether the evidence supported the trial court's conclusion of law that Defendant James R. McKinney made a fraudulent misrepresentation to Plaintiff."

Defendant argues that the evidence preponderates against the trial court's finding that there was a false representation made by defendant McKinney.

■ In order to sustain a cause of action for fraudulent misrepresentation, the plaintiff must show that: 1) the defendant made a representation of an existing or past fact; 2) the representation was false when made; 3) the representation was in regard to a material fact; 4) the false representation was made either knowingly or without belief in its truth or recklessly; 5) plaintiff reasonably relied on the misrepresented material fact; and 6) plaintiff suffered damage as a result of the misrepresentation. *Graham v. First American National Bank*, 594 S.W.2d 723, 725 (Tenn.App. 1979) (citing *Edwards v. Travelers Ins. Co.*, 563 F.2d 105, 110–114 (6th Cir.1977)).

Defendants argue the trial court erred in finding that Metro had made out a claim for fraudulent misrepresentation because: 1) the evidence preponderates against the trial court's finding that defendant McKinney made a false statement of fact in his affidavit; 2) the trial court's factual finding on defendant McKinney's intent does not support the legal conclusion of the court that plaintiff proved a case of fraudulent misrepresentation; and 3) the evidence does not support a legal conclusion that plaintiff reasonably relied upon defendant McKinney's statements to its detriment. It is defendants' insistence that Metro failed to prove all three of these necessary elements.

Defendants first argue that the evidence preponderates against the trial court's finding that defendant McKinney made a false representation. Defendant McKinney represented that his law firm had not been paid for the services invoiced. In his affidavit, McKinney states that the law firm of McKinney & Davis "as of this date have not received payment for the services invoiced." Attached to the affidavit were invoices for the six NHP partnerships which totaled $38,000.00. The invoices were prepared at the request of Mr. Gerald Nicely. McKinney does not state in his affidavit that his law firm had never received any payment for services rendered for the 1984 bond closing. His affidavit simply states that the firm had not been paid for the $38,000.00 referenced in the affidavit.

Metro took the position that defendants had been paid in full for all services for which Metro could find invoices. Defendants testified that its fees for the 1984 closing were in excess of $100,000.00. This proof is uncontradicted by plaintiff. Both defendants testified that the firm's fees relating to its services in 1984 were $44,-

000.00 (based on $2500.00 per million) for the "new money" portion of the bonds issued, plus $92,500.00 for the remarketing of the Series 1983A bonds. We find nothing in the record to contradict this testimony. Plaintiff argues only that defendants had been paid in full for the services for which invoices could be found. We find nothing in the record to show that defendants' services were worth only $44,000.00 or that the standard fee should have been only $44,000.00.

William D. Hoops, another lawyer involved in the 1984 closing, supports the defendants' insistence that they were owed well in excess of $44,000.00 for the services performed in 1984. Mr. Hoops, a partner in the Texas law firm of Butler and Binion and also an experienced bond counsel, testified that his fee for the 1984 closing was $197,500.00. He explained that the aggregate fee included a portion for the "new money" of the issue and that the remainder was for the work performed on the Series 1983A remarketing.

We are of the opinion after a thorough review of this record that the evidence preponderates in favor of defendants' insistence that their fee was $136,500.00 for their 1984 services and that they had not been paid for the $38,000.00 in services referenced in the invoices attached to defendant McKinney's affidavit.

■ Taking into account the $38,000.00 payment to defendants, the defendants would still be owed $51,500 for their 1984 services. The evidence preponderates against the trial court's finding that defendant McKinney made a false representation when he stated that the defendants had not been paid for the $38,000.00 evidenced by the attached invoices.

■ This case was tried to the court without a jury. Therefore, the trial court's finding of fact is reviewed de novo upon the record, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise. Tenn.R.App.P. 13(d).

Our review of this record shows the preponderance of the evidence is otherwise.

Defendants insist that the "trial court's finding of fact on McKinney's intent in making the alleged misrepresentation is inconsistent with its conclusion of law that a fraudulent misrepresentation had been made." The trial court, in analyzing defendant McKinney's intent in making the representation that his firm had not been paid for the services invoiced, held that defendant McKinney "knew or should have known that the fees of the defendants had previously been paid in full." The trial court, relying at least in part upon the foregoing finding, held that plaintiff had proved a claim for fraudulent misrepresentation.

■ We are of the opinion that this finding of intent does not support the subsequent legal conclusion that a fraudulent misrepresentation occurred. For such a claim to be valid, McKinney must have made the representation "1) knowingly, or 2) without belief in its truth, or 3) recklessly, careless whether it be true or false." *Edwards v. Travelers Ins. Co.*, 563 F.2d at 111.

Metro contends that even if the trial court's finding was erroneous, it was harmless error "since the trial court also held that defendants had converted the $38,-000.00."

No where in the record do we find that the trial court made such a finding. The trial court noted that conversion was one of the theories upon which Metro sought recovery. However, the trial court relied upon fraudulent misrepresentation as the ground for awarding Metro a recovery.

■ We are of the opinion that Metro failed to carry its burden of showing that it relied upon the alleged false representations of the defendants. The burden is not upon the defendant to show that the plaintiff was negligent, but rather, the burden is upon the plaintiff to show that its reliance upon any statements defendants may have made was reasonable. We are of the opinion that the record shows that any reliance that Metro may have had was not reasonable. The proof shows that prior to payment being made by Metro to defen-

dants, Gerald Nicely had been told by a representative of Lloyds Bank and a representative of NHP that defendants had already been paid and that Mr. Nicely had within his control all the documentation necessary to determine whether or not defendants should be paid. We are of the opinion that plaintiff's reliance on *Shwab v. Walters*, 147 Tenn. 638, 251 S.W. 42 (1923), is misplaced. In *Shwab*, defendant, a principal in a business being sold to plaintiff, compiled a list of debts which was inaccurate. The court found that the plaintiff's reliance was reasonable because defendant did not keep a record of liabilities or bills payable and therefore the auditors where "dependent on [the defendant] for such knowledge." 147 Tenn. at 642–43, 251 S.W. at 43–44. The facts in the instant case are inapposite to the facts in *Shwab*.

Here, Mr. Nicely made an investigation regarding whether any further fee was due defendants and was told by representatives from both Lloyds Bank and NHP that defendants had already been paid. Mr. Nicely further sought the advice of counsel and then waited approximately one year before making payment. Mr. Nicely admitted that the documents which were used to investigate whether the defendants were owed the $38,000.00 payment after the fact were in his possession well before payment was made.

In *Solomon v. First American National Bank of Nashville*, 774 S.W.2d 935 (Tenn.App.1989), this Court stated: "Generally, a party dealing on equal terms with another is not justified in relying upon representations where the means of knowledge are readily within his reach." *Id.* at 943. We are of the opinion that Metro was dealing on equal terms with defendants and that the means of knowledge were readily within Metro's reach.

It therefore results that the judgment of the trial court is reversed and the cause remanded to the trial court for the collection of costs which are assessed to plaintiff-appellee Metro and for any further necessary proceedings.

TODD, P.J., and CANTRELL, J., dissent.

CANTRELL, Judge, dissenting.

I respectfully dissent from the majority opinion. Since I believe the chancellor reached the right result, I would affirm the lower court's judgment.

In my opinion, the proper resolution of this dispute depends on a determination of whether the defendants were entitled to charge an additional fee in 1984 for any work in connection with the Series 1983A bonds. The record is clear that the defendants were paid the full amount of their fee for the initial work on the 1983 series. They received $35,000 at the closing and $57,500 from the Franklin L. Haney Company on July 9, 1984. The record is equally clear that they were paid the full amount of their bill for the 1984A series. That invoice, sent to New York for the December 31, 1984 closing, amounted to $44,000 for legal services and $1,500 for publishing costs. On March 26, 1986, the Franklin L. Haney Company paid the defendants $47,-000, or $1,500 more than their invoice. The over-payment is not explained in the record.

Thus, the defendants were paid the full amount of their fees, billed at $2,500 per million for the $37 million issue in 1983 and the 1984 issue of $17.6 million. If they were due anything else it had to be earned in connection with the sale of the 1983A series in 1984. They now contend that they were entitled to an additional fee of $92,500 for the "reissuance" or "refunding" of that series in 1984.

I think the evidence preponderates against that contention. All of the documentary evidence reflects that the defendants presented an invoice for $45,500 at the December 31, 1984 closing. The invoices in the record and the schedules to the loan agreements signed by the six limited partners showed $45,500 as the total fees due the defendants. No mention was made of any additional fees due for the 1983A bonds.

After the defendants received the additional $38,000 and were pressed to explain the basis for their claim, they responded that they had only been paid $35,000 for

their services in connection with the 1983A issue, when in fact they had been paid the full amount. They also indicated that they could not verify that they had received the $57,500 check from the Franklin L. Haney Company in 1984. On August 11, 1989, the defendants asserted for the first time that their total fees for the 1984 closing should have been an additional $92,500 for a refund of the 1983A series plus $45,500 for the issuance of the 1984A series.

It is not clear from the record why the defendants contended they were entitled to an additional fee in connection with the 1983A bonds. They did not issue any additional opinions and the bonds were not refunded or remarketed. They were simply not offered to the public until after the 1984A issue. Since the defendants did not submit an invoice for that work and did not contend they were entitled to any additional fees until four and one-half years later, I think the chancellor correctly concluded that they were not entitled to the additional $38,000.

The defendants contend that the chancellor erred in finding that the money was paid to the defendants based on a *fraudulent* misrepresentation. In my judgment, however, it is immaterial whether the representation that the defendants were still due a fee was made with knowledge of its falsity. From this record—which exhibits a lack of attention to the public's business bordering on the shameful—it is conceivable that the representation was simply the result of a mistake. But it is the peculiar province of equity to rectify mistakes, *Reid v. House*, 21 Tenn. 576 (1841), and to afford plaintiffs relief from their own errors when that relief will not cause injustice to the defendant. *Douglass v. Rowland*, 540 S.W.2d 252 (Tenn.App.1976).

I would affirm the chancellor's judgment.