On Application for Rehearing
 

 LYONS, Justice.
 

 On August 14, 2009, this Court affirmed, without an opinion, a judgment entered on a jury verdict awarding compensatory damages to Ronnie Robinson d/b/a ADR Technical Services (“Robinson”)
 
 [1]
 
 in the amount of $78,000 on Robinson’s claim of intentional misrepresentation against Sverdrup Technology, Inc. (“Sverdrup”). In the brief supporting its application for a rehearing, Sverdrup urges this Court to “provide a thoughtful opinion that addresses the serious issues” raised on appeal and in the application. We withdraw our no-opinion affirmance and substitute the following opinion therefor.
 
 [2]
 

 Procedural History and Factual Background
 

 On February 12, 2004, Robinson sued Sverdrup in the Madison Circuit Court. The complaint alleged that Robinson had been acting as Sverdrup’s subcontractor with respect to a United States Air Force project in Tennessee. Under Tennessee substantive law, Robinson asserted claims of breach of contract and fraud arising from events that occurred with respect to Sverdrup’s efforts, through a joint venture, to obtain a new general contract for the project. Although the events at issue occurred in Tennessee, the complaint alleged that “Sverdrup ... is a corporation doing business in the State of Alabama, and maintains corporate offices in Huntsville, Alabama.” In its answer to the complaint, Sverdrup admitted that “it is a corporation doing business in the State of Alabama.” Sverdrup did not assert lack of personal jurisdiction as a defense in its answer or raise the defense in a motion to dismiss pursuant to Rule 12(b), Ala. R. Civ. P. Sverdrup did maintain that Robinson had failed “to plead fraud with specificity.”
 

 Robinson amended his complaint on July 13, 2005, to name additional defendants.
 
 *37
 
 In its answer to the amended complaint, Sverdrup admitted Robinson’s allegation that it maintains corporate offices in Huntsville; Sverdrup again did not assert lack of personal jurisdiction as a defense. Robinson amended his complaint again on September 6, 2005. For the first time in its response to the second amended complaint, Sverdrup moved to dismiss the action for lack of personal jurisdiction.
 

 In its motion to dismiss, Sverdrup argued that the trial court lacked personal jurisdiction over it because, it said, its business in Alabama did not relate to the events giving rise to the complaint. Sverdrup also argued that Robinson’s fraud claims were due to be dismissed because, it said, Robinson did not allege fraud with particularity. The trial court denied Sverdrup’s motion on January 26, 2006, finding that Sverdrup had “regular and systematic contacts with the State of Alabama subjecting it to jurisdiction” and that Robinson had sufficiently pleaded his fraud claims.
 

 Robinson subsequently amended his complaint three more times, ultimately asserting claims against Sverdrup and three other defendants. The other defendants were eventually dismissed, and the claims against Sverdrup were tried to a jury beginning on August 20, 2007. Sverdrup moved for a judgment as a matter of law on several grounds at the close of Robinson’s case-in-chief and again at the close of all evidence. The trial court denied those motions and submitted the case to the jury on Robinson’s claims of breach of contract, promissory fraud, and intentional misrepresentation. On August 28, 2007, the jury returned a verdict for Sverdrup on the breach-of-contract and promissory-fraud claims and for Robinson on the claim of intentional misrepresentation. The jury awarded Robinson $78,000 in compensatory damages. The trial court entered a judgment on the verdict on September 4, 2007. Sverdrup renewed its motion for a judgment as a matter of law on October 1, 2007. The trial court denied that motion, and Sverdrup appealed.
 

 The evidence submitted at trial showed the following facts relevant to this appeal. Under a general contract known as “Effort T,” Sverdrup performed test operations at the United States Air Force Arnold Engineering Development Center (“AEDC”) in Tullahoma, Tennessee, between 1995 and 2003. Pursuant to federal regulations governing government contractors, Sverdrup was required to conduct periodic inventory of the government property in its possession.
 
 [3]
 
 To satisfy this requirement, Sverdr-up subcontracted with Robinson.
 

 Under the subcontract, Robinson worked full-time at the AEDC performing inventory of the more than 70,000 government items in Sverdrup’s possession. Robinson reported to and coordinated with individuals in Sverdrup’s property-management section. Under the Effort T contract, before the end of each fiscal year, Robinson submitted a cost proposal to Sverdrup relative to his activities for the following year. Sverdrup then submitted the cost proposal to the Air Force, and the Air Force approved funding for Robinson’s subcontract. Robinson did not perform work for any entities other than Sverdrup.
 

 The Effort T contract was to expire on September 30, 2003. In August or September 2002, the Air Force released a draft request for proposal (“RFP”) seeking a general contractor to perform testing
 
 *38
 
 operations and administrative and support services at the AEDC beginning on October 1, 2008. The Air Force released a final RFP in December 2002. Proposals were to be submitted in February 2003 and a general contract awarded on June 80, 2003.
 

 Sverdrup planned to submit a proposal to the Air Force in response to the RFP as part of a joint venture known as Aerospace Testing Alliance. Instead of merely performing test operations as it had under prior contracts, Sverdrup — with the other entities in the joint venture' — also proposed to perform administrative and support services at the AEDC. Sverdrup began work on the proposal in early 2002. In the summer of 2002, Sverdrup decided to use different inventory methods than had been used under the Effort T contract and to eliminate Robinson as a subcontractor, thereby reducing property-management costs. Sverdrup incorporated this decision into the proposal as “Initiative 13.” Kenny Frame, who was Sverdrup’s senior vice president and director of business development from 2001 to 2006, stated that, because of the competitive nature of the proposal process, information regarding Initiative 13 and the other initiatives included in the proposal was “highly secret” and “tightly, tightly controlled.” Frame testified that even some individuals on the team developing the proposal were not aware of the content of the initiatives.
 

 Robinson testified that he knew in 2002 that the Effort T contract was to expire and that he would need to obtain a subcontract under the new proposal being prepared by Sverdrup or that he would no longer be involved with work at the AEDC. According to Robinson, the following events occurred before Sverdrup submitted its proposal to the Air Force in response to the RFP. In the summer of 2002, Robinson contacted Mark Kelly, Sverdrup’s administrator of subcontracts under the Effort T contract. At Kelly’s instruction, Robinson contacted Frame in August 2002. Frame told Robinson that he had to “get approval” before Robinson could “be on the contract.”
 
 [4]
 
 According to Robinson, he and Frame spoke again in early 2003, and Frame “told [Robinson] that he had got approval and that [Robinson] needed to get in contact with Tom Mahler,” Sverdrup’s director of business operations. When Robinson did so, Frame had already contacted Mahler, and Mahler was preparing a “teaming agreement.”
 

 Robinson signed the teaming agreement on February 4, 2003. It stated:
 

 “[l.]a. The purpose of this Teaming Agreement is to enter into a joint effort to submit a proposal to the [Ah' Force] in the interest of obtaining the prime contract to be awarded for the Program.
 

 [[Image here]]
 

 “d. [Sverdrup] will be proposed as the Prime Contractor and ADR Technical Services will be proposed as the subcontractor for performing the work specified in Exhibit ‘A’ hereof, ‘Description of Subcontract Work.’ ”
 

 Exhibit A of the teaming agreement provided: “It is anticipated that ADR [Technical Services] will provide support in the areas of property and inventory management and/or other areas as mutually agreed to by [Sverdrup] and [ADR Technical Services].” Robinson testified that he understood that he was to perform the same inventory services for Sverdrup that
 
 *39
 
 he had performed under the Effort T contract.
 

 According to Frame, he did not have any contact with Robinson until December 2002 or January 2003. At that time, Frame knew that Sverdrup had already decided to use Initiative 13 in the proposal and that it did not plan to use Robinson as a subcontractor. Frame testified regarding his conversation with Robinson:
 

 “I chose my words carefully. I didn’t want to disclose what we were going to do. It would be disclosing a competitive advantage. If he chose not to go with us, he could go to a competitor and compromise our position. So I said, ‘We have chosen to take an internal approach.’ ”
 

 According to Frame, he then told Robinson: “However, I would like you to talk to Tom Mahler about signing — about a teaming agreement in which we could utilize you for property management services in general and potentially other things your company can offer.” Frame testified that he intended to have an “indefinite delivery” arrangement with Robinson, in which there were no guarantees that Sverdrup would use Robinson as a subcontractor. The trial court questioned Frame:
 

 “Trial Court: Did you use the terms in working or talking to him about indefinite delivery?
 

 “Frame: I did not.
 

 “Trial Court: Okay. And tell me again what you told him to talk about with Tom Mahler.
 

 “Frame: To talk about getting a teaming agreement to the effect that that would allow him to have the opportunity to do work in property management or other areas of the contract....”
 

 Robinson denied that Frame told him that Sverdrup was going to internalize inventory management. He also stated that before he signed the teaming agreement, no one talked with him about providing services other than the physical inventory he had been doing.
 

 Mahler was unaware of Initiative 13. He testified that Frame merely advised him to contact Kelly regarding Robinson. Mahler explained that when Kelly advised him that Robinson had performed well:
 
 “I
 
 thought that we would proceed to get together a teaming agreement with [Robinson] to continue performance as a subcontractor. I thought ... that we would carry them on into the new contract.” Mahler testified that he intended Robinson to perform property-management functions under the proposal but that the teaming agreement did not necessarily mean that he would have a subcontract.
 

 Ten days after Robinson signed the teaming agreement, Sverdrup’s joint venture — Aerospace Testing Alliance — submitted the proposal to the Air Force. Aerospace Testing Alliance did not propose to use Robinson as a subcontractor. Instead, the proposal included Initiative 13, which expressly provided for “elimination of the auditing subcontractor,” i.e., Robinson. The Air Force received proposals from two other competitors in response to its RFP. On June 30, 2003, the Air Force awarded the new contract to Aerospace Testing Alliance.
 

 Robinson testified that in July 2003 Mahler contacted him and stated that he was “a part of the team”; that he would be required to submit a cost proposal for a subcontract; and that any applications for employment that Robinson or his employees may have submitted to the joint venture should be withdrawn because they were not needed. Robinson testified that he advised his employees that they would continue their employment when the new general contract took effect. Robinson further testified that he was subsequently
 
 *40
 
 asked to submit a cost proposal using the same format and information he had used under the Effort T contract. Mahler denied speaking with Robinson in July 2003, but on September 8, 2003, Mahler’s department submitted a proposed subcontract to the Air Force based on Robinson’s cost proposal. The Air Force rejected Robinson’s proposed subcontract on September 9, 2003, because it conflicted with Initiative 13. An Air Force representative testified that Robinson’s proposed subcontract “would have been fine” if it had been included in the general contractor’s proposal.
 

 Robinson testified that Sverdrup notified him on September 18, 2003, that the Air Force had rejected his subcontract. Robinson testified:
 

 “Pretty much I was just overwhelmed. I couldn’t even understand what had happened because I didn’t even see this coming as far as it was nothing that I could even see this would even happen and I knew that the only way this was denied was something wasn’t done properly.
 

 [[Image here]]
 

 “... At that point, I immediately went back to my office and called my employees. Because I had already informed them three months earlier that they pretty much had a job, and I wanted to make sure they knew that they didn’t have a job.”
 

 Robinson testified that he telephoned and wrote Sverdrup officials to find out why his subcontract had been rejected but that he never received an explanation.
 

 Robinson fulfilled the terms of his subcontract under the Effort T contract and continued working at the AEDC until September 30, 2003. When Robinson’s subcontract ended, Sverdrup paid him $34,000 in severance pay. Robinson testified that the severance pay was for sick leave, vacation, and service pay, and that he divided it among himself and his two employees.
 

 At Sverdrup’s instruction, Robinson applied for employment with the joint venture in late September 2003. Robinson testified that he received no response to the application. He testified that, had he known earlier that Sverdrup did not plan to use him as a subcontractor, he would have applied sooner for another form of employment at the AEDC. Sverdrup maintained that Robinson would not have been hired even if he had applied earlier because the joint venture hired only former employees of Sverdrup and other members of the joint venture. Robinson also testified that if he had known in February that Sverdrup was not going to use him as a subcontractor, he would have begun looking elsewhere for employment.
 

 Robinson testified that he lost the revenue he would have made on a subcontract had Sverdrup included him in the proposal. At trial, Robinson submitted his tax returns from 1998 through 2003; based on the returns, he testified that during those years the annual profit of his business varied from its lowest at $63,000 in 1999 to its highest at $123,000 in 2002. Robinson also submitted the cost proposal he gave Sverdrup in August 2003 and the proposed subcontract Sverdrup submitted to the Air Force. Sverdrup noted that Robinson had underpaid his personal federal taxes in certain years, but Robinson denied that the underpayment related to his calculations regarding the profits of his business.
 

 Robinson testified that, when he learned that his subcontract had not been approved in September 2003, he immediately began looking for work elsewhere. In addition to his application for employment with the joint venture, he made inquiries of and submitted resumes to potential employers through the Internet and personal
 
 *41
 
 contacts. He stated that he was willing to do whatever work he could find. Robinson eventually found temporary work in December 2004. His 2004 tax return showed that his income for that year was $1,970. He testified that, until he secured temporary work, he searched full-time for a job and that, when he was performing temporary work, he continued searching three to four hours each day. Robinson continued his job search throughout 2005. His tax return showed that his income for that year was $24,922. Ultimately, in 2006, Robinson found work in Philadelphia, Pennsylvania, making approximately $37,000 per year. Robinson testified that he and his wife had never lived outside the Southeast before and that they did not know anyone in Pennsylvania.
 

 Analysis
 

 I.
 
 Personal Jurisdiction
 

 Sverdrup argues on appeal that the trial court lacked personal jurisdiction over it and that the trial court erred in denying its motion to dismiss on that basis. Sverdrup has admitted that it does business in Alabama and that it maintains corporate offices in Huntsville. However, Sverdrup argues that Robinson did not show that Sverdrup’s acts at issue in this action — acts taken in furtherance of the joint venture
 
 [5]
 
 — were purposefully directed toward Alabama. Accordingly, Sverdrup argues, it may not be held liable in Alabama for any actions it took on behalf of the joint venture.
 
 [6]
 

 Sverdrup has waived the defense of lack of jurisdiction over the person. The trial court’s rejection of the defense on the merits was gratuitous. “An appellate court considers de novo a trial court’s judgment on a party’s motion to dismiss for lack of personal jurisdiction.”
 
 Elliott v. Van Kleef,
 
 880 So.2d 726, 729 (Ala.2002). Rule 12(b), Ala. R. Civ. P., provides: “Every defense, in law or fact, to a claim for relief in any pleading ... shall be asserted in the responsive pleading thereto if one is permitted, except that the following defenses may ... be made by motion: ... (2) lack of jurisdiction over the person....” Rule 12(h)(1), Ala. R. Civ. P., states: “A defense of lack of jurisdiction over the person ... is waived ... if it is neither made by motion under this rule nor included in a responsive pleading or an amendment thereof permitted by Rule 15(a) to be made as a matter of course.” Accordingly, the defense of lack of personal jurisdiction is waived if it is not raised in the first responsive pleading or in a motion filed before the first responsive pleading pursuant to Rule 12(b). See, e.g.,
 
 Ex parte Maness,
 
 386 So.2d 429, 431 (Ala.1980) (applying Rule 12(h)(1) to conclude: “Here, defendants’ motion for change of venue was not made until ten months after their pleadings. It was, therefore, waived.”).
 
 [7]
 

 
 *42
 
 In this case, Sverdrup did not file, before it filed its answer, a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), and it did not raise the defense in its answer to the complaint. It is apparent from the original complaint that Robinson asserted claims against Sverdrup for events that occurred in Tennessee relative to its participation in the joint venture’s proposal in response to the RFP. Accordingly, the defense of lack of personal jurisdiction was available to Sverdrup at the time it filed its first responsive pleading. Sverdrup did not raise the defense until it filed its motion to dismiss, more than 18 months later. Therefore, it appears that Sverdrup has waived its challenge to the trial court’s exercise of personal jurisdiction over it.
 

 Furthermore, this Court has explained:
 

 “The Due Process Clause of the Fourteenth Amendment permits a forum state to subject a nonresident defendant to its courts only when that defendant has sufficient ‘minimum contacts’ with the forum state.
 
 International Shoe Co. v. Washington,
 
 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). The critical question with regard to the nonresident defendant’s contacts is whether the contacts are such that the nonresident defendant ‘ “should reasonably anticipate being haled into court” ’ in the forum state.
 
 Burger King Corp. v. Rudzewicz,
 
 471 U.S. 462, 473, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), quoting
 
 World-Wide Volkswagen Corp. v. Woodson,
 
 444 U.S. 286, 295, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). The sufficiency of a party’s contacts are assessed as follows:
 

 “ ‘Two types of contacts can form a basis for personal jurisdiction: general contacts and specific contacts.
 
 General contacts, which give rise to general personal jurisdiction, consist of the defendant’s contacts with the forum state that are unrelated to the cause of action and that are both “continuous and systematic." Helicopteros Nacionales de Colombia, S.A. v. Hall,
 
 466 U.S. 408, 414 n. 9, 415, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); [citations omitted]. Specific contacts, which give rise to specific jurisdiction, consist of the defendant’s contacts with the forum state that are related to the cause of action.
 
 Burger King Corp. v. Rudzewicz,
 
 471 U.S. 462, 472-75, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). Although the related contacts need not be continuous and systematic, they must rise to such a level as to cause the defendant to anticipate being haled into court in the forum state.
 
 Id.’
 

 “Ex parte Phase III Constr., Inc.,
 
 723 So.2d 1263, 1266 (Ala.1998) (Lyons, J., concurring in the result)....
 

 “In the case of either general
 
 in per-sonam
 
 jurisdiction or specific
 
 in person-am
 
 jurisdiction, ‘[t]he “substantial connection” between the defendant and the forum state necessary for a finding of minimum contacts must come about by
 
 an action of the defendant purposefully
 
 
 *43
 

 directed toward the forum State.’ Asahi Metal Indus. Co. v. Superior Court of California,
 
 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987).”
 

 Elliott,
 
 830 So.2d at 730-31 (emphasis added). Similarly, this Court has stated: “General jurisdiction applies where a defendant’s activities in the forum state are ‘substantial’ or ‘continuous and systematic,’
 
 regardless of whether those activities gave rise to the lawsuit.” Leventhal v. Harrelson,
 
 723 So.2d 566, 569 (Ala.1998) (citing
 
 Helicopteros Nacionales de Colombia, S.A. v. Hall,
 
 466 U.S. 408, 415 n. 9, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984), in which the United States Supreme Court also stated: “When a State exercises personal jurisdiction over a defendant
 
 in a suit not arising out of or related to the defendant’s contacts with the forum,
 
 the State has been said to be exercising ‘general jurisdiction’ over the defendant.”).
 

 Sverdrup admits doing business in Alabama and maintaining corporate offices in Huntsville. It, therefore, admittedly has “purposefully directed” acts toward this State sufficient to support a finding of “minimum contacts.” The regular maintenance of offices in Alabama is an activity both “continuous and systematic,” so as to subject Sverdrup to general personal jurisdiction in this State. Consequently, it may be subject to jurisdiction in Alabama, regardless of whether the activities forming the basis of that jurisdiction gave rise to the present action. Therefore, even if the defense had not been waived, it fails as a matter of law.
 

 II.
 
 Particularity of the Fraud Claims
 

 Sverdrup also argues that Robinson failed to plead his fraud claims with particularity and, therefore, that the trial court erred in submitting the intentional-misrepresentation claim to the jury and in entering a judgment on the jury’s verdict in favor of Robinson on that claim. Sverdrup does not allege any particular defect in pleading, merely that “Robinson did not plead fraud with the particularity expected from Tennessee’s substantive law.” Moreover, Sverdrup does not cite any Tennessee authority to support its argument. Additionally, without explaining how they apply except to state that Robinson “omitted the
 
 sine qua non”
 
 of his claim, Sverdrup also cites two cases from the United States Court of Appeals for the Eleventh Circuit regarding Rule 9(b), Fed. R. Civ. P., as it relates to claims under the False Claims Act, 31 U.S.C. § 3729 et seq. See
 
 United States ex rel. Atkins v. McInteer,
 
 470 F.3d 1350 (11th Cir.2006), and
 
 United States ex rel. Clausen v. Laboratory Corp. of America, Inc.,
 
 290 F.3d 1301 (11th Cir.2002).
 

 Rule 9(b), Ala. R. Civ. P., provides: “In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.” The Committee Comments on 1973 Adoption of Rule 9 explain:
 

 “[TJhis special requirement [in Rule 9(b) ] as to fraud and mistake does not require every element in such actions to be stated with particularity. It simply commands the pleader to use more than generalized or conclusory statements to set out the fraud complained of. The pleading must show time, place and the contents or substance of the false representations, the fact misrepresented, and an identification of what has been obtained .... But knowledge by the defendant of the falsity of the representation and reliance on the representation by the plaintiff can still be generally alleged .... [I]t should be expected that the courts will strive to find the details necessary for the sufficiency of such a
 
 *44
 
 complaint, if the pleading gives fair notice to the opposing party....”
 

 See also
 
 Bethel v. Thorn,
 
 757 So.2d 1154, 1158 (Ala.1999). “The purpose of this rule is to give fair notice to the opposing party.”
 
 Winn-Dixie Montgomery, Inc. v. Henderson,
 
 371 So.2d 899, 901 (Ala.1979); see also
 
 Kabel v. Brady,
 
 519 So.2d 912, 916 (Ala.1987).
 

 In his fifth amended complaint,
 
 [8]
 
 Robinson alleged 1) that he and Sverdrup engaged in discussions regarding Sverdrup’s use of Robinson as a subcontractor in its proposal; 2) that those discussions culminated in a teaming agreement in February 2003; 3) that Sverdrup worked on the proposal long before the execution of the February 2003 teaming agreement and had decided to internalize inventory services; 4) that Sverdrup and the other joint venturers included a new system of inventory, Initiative 13, in its proposal to the Air Force; 5) that Sverdrup never told Robinson about these changes in inventory management; 6) that, per Sverdrup’s instruction, Robinson submitted a cost proposal with a description of his existing work, although Sverdrup knew that such a proposed subcontract would be insufficient; 7) that Robinson lost the opportunity to apply for employment with the joint venture when Sverdrup instructed him not to apply because he was already “part of the team”; 8) that Sverdrup made misrepresentations to Robinson in February and June 2003; 9) that Robinson relied on the misrepresentations by submitting a nonconforming subcontract and by not applying for employment with the joint venture; and 10) that Robinson suffered damage in lost profits and lost employment.
 

 Based on the foregoing, it is apparent that Robinson alleged the time of the misrepresentations (February 2003 and June 2003), the content of the misrepresentations (that in preparing the proposal in response to the RFP Sverdrup had not changed its inventory procedures and had named Robinson as a subcontractor), the facts misrepresented (that Sverdrup had changed its inventory procedures and had not proposed to use Robinson as a subcontractor), the defendant’s knowledge of the falsity of the representations (Sverdrup’s knowledge while it was developing the proposal that it was changing its inventory procedures and that it would not use Robinson as a subcontractor), and the result of the misrepresentations (Robinson’s exclusion from the development of the proposal).
 

 Although it appears that Robinson did not allege the place where the misrepresentations occurred, his fifth amended complaint included sufficient allegations to place Sverdrup on notice of the acts complained of; Robinson, therefore, satisfied Rule 9(b). See
 
 VanLoock v. Curran,
 
 489 So.2d 525, 534 (Ala.1986) (“While the pleading is perhaps not a model of clarity and specificity, it sufficiently comports with the purpose of Rule 9(b) in that it gives the defendants fair notice of the acts complained of.”). The record supports this conclusion in that the trial court’s pretrial order describes Sverdrup’s defenses to Robinson’s allegation of intentional misrepresentation. The trial court also summarized Sverdrup’s defenses to the intentional-misrepresentation claim in open court before trial. Accordingly, it is apparent that Robinson’s allegations of fraud sufficiently apprised Sverdrup of the matters at issue so that Sverdrup was able to formulate a defense. Thus, the fifth amended complaint satisfied Rule 9(b).
 
 *45
 
 Sverdrup’s conclusory claim of lack of particularity in pleading the fraud claims without any elaboration as to what was missing does not warrant a reversal of the trial court’s judgment.
 

 III.
 
 Judgment as a Matter of Law
 

 Sverdrup next argues that the trial court erred in denying its motion for a judgment as a matter of law (“JML”). Sverdrup largely asks us to reweigh the evidence presented to the jury; however, to the extent that Sverdrup properly seeks review of the denial of its motion for a JML, it raises issues regarding the sufficiency of the evidence of intentional misrepresentation generally and the evidence of damages specifically.
 

 “When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in deciding whether to grant or deny the motion for a JML.
 
 Palm Harbor Homes, Inc. v. Crawford,
 
 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution.
 
 Carter v. Henderson,
 
 598 So.2d 1350 (Ala.1992). The nonmovant must have presented substantial evidence in order to withstand a motion for a JML. See § 12-21-12, Ala.Code 1975;
 
 West v. Founders Life Assurance Co. of Florida,
 
 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury.
 
 Carter,
 
 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw.
 
 Id.
 
 Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court’s ruling.
 
 Ricwil, Inc. v. S.L. Pappas & Co.,
 
 599 So.2d 1126 (Ala.1992).”
 

 Waddell & Reed, Inc. v. United Investors Life Ins. Co.,
 
 875 So.2d 1143, 1152 (Ala.2003).
 

 Under Tennessee law, the elements of a claim of intentional misrepresentation have been stated as follows:
 

 “In order to prove a claim based on fraudulent or intentional misrepresentation, a plaintiff must show that:
 

 “ 1) the defendant made a representation of an existing or past fact; 2) the representation was false when made; 3) the representation was in regard to a material fact; 4) the false representation was made either knowingly or without belief in its truth or recklessly; 5) plaintiff reasonably relied on the misrepresented material fact; and 6) plaintiff suffered damage as a result of the misrepresentation.’
 

 “Metro. Gov’t of Nashville & Davidson County v. McKinney,
 
 852 S.W.2d 233, 237 (Tenn.Ct.App.1992);
 
 see First Nat’l Bank v. Brooks Farms,
 
 821 S.W.2d 925, 927 (Tenn.1991);
 
 Lopez v. Taylor,
 
 195 S.W.3d 627, 634 (Tenn.Ct.App.2005).”
 

 Walker v. Sunrise Pontiac-GMC Truck, Inc.,
 
 249 S.W.3d 301, 311 (Tenn.2008).
 
 [9]
 

 Viewed in the light most favorable to Robinson, the evidence presented at trial showed that Sverdrup had decided as early
 
 *46
 
 as the summer of 2002 to change the method of inventory management it proposed for the AEDC project and to exclude Robinson as a subcontractor. Although that information was closely held within the company, Frame admitted that he was aware of these decisions before his dealings with Robinson.
 

 The evidence regarding Frame’s representations to Robinson was disputed. Robinson testified that Frame told him that he had obtained approval for Robinson to “be on the contract,” i.e., the proposal, and that Robinson should speak to Mahler about obtaining a teaming agreement for that purpose. Frame, however, testified that he merely told Robinson that Sverdrup intended to “take an internal approach,” but that he should contact Mahler about obtaining a teaming agreement for other purposes. Although the evidence was disputed, it was sufficient, for purposes of defending a motion for a JML, to show that Sverdrup, through Frame, knowingly made a false representation of an existing fact.
 
 [10]
 
 Robinson, therefore, presented sufficient evidence of the first four elements of intentional misrepresentation under Tennessee law: that “‘1) the defendant made a representation of an existing or past fact; 2) the representation was false when made; 3) the representation was in regard to a material fact; 4) the false representation was made either knowingly or without belief in its truth or recklessly....’”
 
 Walker,
 
 249 S.W.3d at 311 (quoting
 
 Metropolitan Gov’t of Nashville & Davidson County v. McKinney,
 
 852 S.W.2d 233, 237 (Tenn.Ct.App.1992)).
 

 Regarding the fifth element, whether the “ ‘plaintiff reasonably relied on the misrepresented material fact,’ ”
 
 id.,
 
 the evidence showed that Robinson submitted a cost proposal for a subcontract that did not conform to the proposal presented by Sverdrup’s joint venture in response to the RFP. Robinson also testified that he relied on Frame’s representation by not applying for employment with the joint venture and by not seeking other employment opportunities sooner. Sverdrup’s representatives denied that Robinson could have obtained employment with the joint venture. It is also apparent that Robinson did not seek other subcontracting opportunities with Sverdrup’s competitors. Again, although disputed, this evidence sufficiently raised a question for the jury regarding Robinson’s reliance on Sverdrup’s alleged misrepresentations.
 

 Finally, regarding whether Robinson “ ‘suffered damage as a result of the misrepresentation,’ ”
 
 Walker,
 
 249 S.W.3d at 311, Sverdrup argues that Robinson did not submit sufficient proof of damages for mental anguish or for lost profits. Regarding the evidence of mental-anguish damages, Sverdrup does not cite any authority in its brief on appeal. As a result, Sverdrup has failed to comply with the requirements of Rule 28(a)(10), Ala. R.App. P. For the first time in its reply brief, Sverdrup cites authority to support its argument; however, this Court will not consider arguments raised for the first
 
 *47
 
 time in a reply brief. See
 
 Kyser v. Harrison,
 
 908 So.2d 914, 917 (Ala.2005)(fmding argument waived under Rule 28(a)(10) where argument was made in initial brief but was not supported with authority until reply brief).
 

 Regarding the evidence of lost profits, Sverdrup focuses on the accuracy of Robinson’s profit calculations. Specifically, Sverdrup argues that Robinson did not present evidence from which lost profits could be calculated to a reasonable certainty. Citing
 
 Baker v. Hooper,
 
 50 S.W.3d 463, 470 (Tenn.Ct.App.2001)(stating lost profits are recoverable for breach of contract if the amount can be proved with reasonable certainty), and
 
 Kids’ Universe v. In2Labs,
 
 95 Cal.App.4th 870, 116 Cal.Rptr.2d 158 (2002)(discussing lost-profits damages under California law), Sverdrup argues that, because there were no definite terms to any proposed subcontract, any profits Robinson expected from a subcontract were speculative. Sverdrup also argues that Robinson should not have been permitted to rely on evidence of past profits because Sverdrup changed its method of inventory.
 
 [11]
 

 Robinson notes that, under Tennessee law, “[w]hen lost profits are the proper measure of damages, they need only be proved with reasonable certainty, not with mathematical precision.”
 
 McClain v. Kimbrough Constr. Co.,
 
 806 S.W.2d 194, 200 (Tenn.Ct.App.1990). He relies on his testimony regarding the profits of his business in past years and the supporting tax returns. Based on this evidence, Robinson argues, the jury could calculate lost profits to a reasonable certainty.
 

 Our inquiry is limited to whether there was sufficient evidence of damage to submit Robinson’s claim to the jury. The evidence regarding Robinson’s profit calculations was disputed. However, Robinson presented evidence of lost profits in the form of documents showing his previous years’ tax returns, his August 2003 cost proposal, the proposed subcontract Sverdrup submitted to the Air Force, and testimony from an Air Force representative that Robinson’s proposed subcontract would have been “fine” had Sverdrup’s proposal not called for removal of Robinson as a subcontractor. Sverdrup did not show that its dealings with Robinson were subject to market forces or such other uncertainties as would render anticipated profits in a typical subcontract speculative. Based on the evidence Robinson submitted, we cannot say, as a matter of law, that the jury could not have determined the profits Robinson would have made under a subcontract with Sverdrup to a reasonable certainty.
 

 Furthermore, Robinson presented other evidence to support an award of damages, specifically evidence regarding his shock at learning that his subcontract had been rejected, his loss of earnings after his subcontract at the AEDC ended, his extended job search, and his out-of-state move to find work. Therefore, even -without evidence regarding lost profits, Robinson presented evidence from which the jury could have determined that he suffered damage as a result of Sverdrup’s misrepresentations.
 

 Based on the foregoing, we cannot say as a matter of law that the jury could not
 
 *48
 
 have concluded that Robinson was entitled to a judgment in the amount of $78,000 on his claim of intentional misrepresentation. As a result, Sverdrup was not entitled to a JML, and the trial court did not err in denying its motion.
 

 Conclusion
 

 Based on the
 
 foregoing,
 
 we overrule Sverdrup’s application for a rehearing and affirm the trial court’s judgment.
 

 NO-OPINION AFFIRMANCE OF AUGUST 14, 2009, WITHDRAWN; OPINION SUBSTITUTED; APPLICATION OVERRULED; AFFIRMED.
 

 COBB, C.J., and STUART, BOLIN, and MURDOCK, JJ., concur.
 

 [1]
 

 . Robinson operates ADR Technical Services as a sole proprietorship.
 

 [2]
 

 . Sverdrup raises the same arguments in its application for a rehearing that it raised in its briefs on appeal. For purposes of simplification, this opinion will refer only to Sverdrup's briefs on appeal.
 

 [3]
 

 . See 48 C.F.R. § 45.508 (“The contractor shall periodically physically inventory all Government property ... in its possession or control. ...”) (Title 48, Part 45, was amended in 2007, and subpart 508 no longer appears in the Code of Federal Regulations. However, die parties do not dispute that it was effective at all times relevant to this action.).
 

 [4]
 

 . Robinson referred to Sverdrup’s proposal in response to the RFP as “the contract” throughout his testimony.
 

 [5]
 

 . In its brief on appeal, Sverdrup refers to Aerospace Testing Alliance as a partnership; however, no allegation or evidence in the record shows that it is anything more than a joint venture.
 

 [6]
 

 . Indeed, Sverdrup spends a significant portion of its brief arguing that the trial court lacked personal jurisdiction over the joint venture and that, because Sverdrup's actions giving rise to the complaint were taken on behalf of the joint venture, the trial court did not have jurisdiction over it.
 

 [7]
 

 . See also 5C C. Wright & A. Miller,
 
 Federal Practice and Procedure
 
 § 1391 (3d ed. 2001) (“If a party does not make a preliminary motion or if a defense was not available at the time he first moved, that party is not vulnerable to a waiver argument and may present a Rule 12(b)(2) through Rule 12(b)(5) challenge
 
 but it must be included in the responsive pleading. The penalty for failing to raise any of these defenses at this point is waiver as numerous federal courts have held,
 
 as the illustrative case citations in the note below from throughout the federal judicial system demonstrate,
 
 *42
 
 and as the text of the rule makes clear.... Thus, the message conveyed by the present version of Rule 12(h)(1) seems quite clear. It advises a litigant to exercise great diligence in challenging personal jurisdiction, venue, or service of process.
 
 If that party wishes to raise any of these defenses, that must be done at the time the first significant defensive move is made
 
 — whether
 
 it be by way of a Ride 12 motion or a responsive pleading.
 
 Furthermore, a party can be held to have waived a defense listed in Rule 12(h)(1) through conduct, such as extensive participation in the discovery process or other aspects of the litigation of the case even if the literal requirements of Rule 12(h)(1) have been met ....” (footnotes omitted; emphasis added)).
 

 [8]
 

 .
 
 Ex parte Puccio,
 
 923 So.2d 1069, 1072 (Ala.2005)("An amended complaint supersedes the previously filed complaint and becomes the operative pleading, unless it subsequently is modified.”).
 

 [9]
 

 . In his brief in response to Sverdrup’s original brief, Robinson cites a slightly different statement of the elements of intentional misrepresentation from
 
 Shahrdar v. Global Housing, Inc.,
 
 983 S.W.2d 230, 237 (Tenn.Ct.App.1998). Sverdrup takes issue with this difference in its reply brief; however, a close reading of the two statements shows that they are not materially different.
 

 [10]
 

 . Sverdrup argues that Robinson impermis-sibly relied on an “imputed knowledge” theory because, it says, Mahler and others who made representations to him did not have actual knowledge of Initiative 13. Sverdrup contends that Tennessee law does not allow recovery for intentional misrepresentation under such a theory and that, to recover against the corporation, Robinson must show that each corporate representative who made a misrepresentation to him had the requisite knowledge and intent. We need not reach this question, however, because Robinson presented sufficient evidence showing that Frame, a corporate officer with knowledge of Initiative 13, made false representations to him of existing facts.
 

 [11]
 

 . Sverdrup cites
 
 General Constr. Contractors Ass’n, Inc. v. Greater St. Thomas Baptist Church,
 
 107 S.W.3d 513, 524 (Tenn.Ct.App.2002) (finding lost profits speculative in breach-of-contract action);
 
 Anderson-Gregory Co. v. Lea,
 
 51 Tenn.App. 612, 370 S.W.2d 934, 937 (1963)(finding that damages in breach-of-contract action should be limited to damages actually suffered); and
 
 McClain v. Kimbrough Constr. Co.,
 
 806 S.W.2d 194, 200-01 (Tenn.Ct.App.1990) (applying formula to determine subcontractor’s net profits).