IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 26, 2016 Session

# DEBORAH C. RUSSELL v. HSBC MORTGAGE SERVICES, INC. ET AL.

**Appeal from the Circuit Court for Davidson County**
**Nos. 06C1899, 07C3102      Thomas W. Brothers, Judge**

_____

**No. M2015-00197-COA-R3-CV – Filed April 15, 2016**
_____

A homeowner alleges that a mortgage company promised her favorable terms to induce her to refinance her mortgage but the actual loan did not contain the terms discussed. She further alleges that company representatives led her to believe, after she received copies of some of the loan documents, that the discrepancy in the loan terms was a "mistake" that would be corrected. The homeowner filed this case against several entities, including the mortgage company. In the order at issue in this appeal, the trial court granted the defendants summary judgment on all of the homeowner's causes of action and on their counterclaim. We have concluded that the trial court properly granted summary judgment on the claim for violation of the Truth in Lending Act. With regard to the homeowner's claims for intentional and negligent misrepresentation, we find that there remain genuine issues of material fact and that the trial court therefore erred in granting summary judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Reversed and Remanded in Part**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and W. NEAL MCBRAYER, J., joined.

Deborah Chandler Russell, appellant, Greenbrier, Tennessee, Pro Se.

Jonathan Cole and Joy Boyd Longnecker, Nashville, Tennessee, for the appellee, HSBC Mortgage Services, Inc.

# OPINION

## FACTUAL AND PROCEDURAL BACKGROUND

This is the second appeal in this case regarding the refinancing of the home of Deborah Russell in 2001. In the first appeal, *Russell v. Household Mortgage Services*, No. M2008-01703-COA-R3-CV, 2012 WL 2054388, at *5-7 (Tenn. Ct. App. June 7, 2012), this Court reversed the trial court's grant of summary judgment with respect to Ms. Russell's claims for intentional misrepresentation, negligent misrepresentation, fraud, and violation of the Truth In Lending Act, and affirmed the dismissal of her claim under the Tennessee Consumer Protection Act.

The pertinent factual allegations are set forth in Ms. Russell's amended complaint. In or around June 2000, a representative of Household Mortgage Services, Inc. ("Household") solicited Ms. Russell by mail and by telephone about refinancing her mortgages and consolidating her debts. According to Ms. Russell, she visited Household's offices on Gallatin Road in Madison, Tennessee and discussed the possibility of refinancing with a person named "Sandy," who represented herself to be an employee of Household. Ms. Russell told Sandy that her new monthly payment could not be more than $850 a month because she could not afford anything higher than that; Sandy assured her that the actual payment "might be a few dollars less or a few dollars more but such a payment amount would be no problem."

Around June 13, 2000, Ms. Russell asserts, she visited the Household offices again to sign some paperwork. She was told that her first and second mortgages, to GMAC Mortgage and AmSouth, respectively, would be paid in full at closing and that her property taxes and property insurance would be escrowed and included in her mortgage payments. Ms. Russell states that she relied upon these representations.

Around July 21, 2000, Ms. Russell appeared at the law offices of William Davis in Brentwood, Tennessee for the closing. She asked for a copy of all of the documents she signed. Later that afternoon, she was faxed a copy of a Truth In Lending Disclosure listing SouthStar Funding, LLC ("SouthStar") as the lender, not Household as Ms. Russell had expected; a promissory note also listing SouthStar as the lender; a monthly payment letter giving $890.53 as the monthly payment; a settlement statement; and a portion of the Uniform Residential Loan Application. Ms. Russell was told that all of the closing documents would be mailed to her.

When she had not received copies of the closing documentation four or five days later, Ms. Russell alleges, she called the law offices of William Davis. Someone at the law office told her that they no longer provided closing services for Household and provided her with a toll free number. After she figured out how to bypass the automated

- 2 -

system, Ms. Russell reached a person named Janice Powell, who informed her that she might not receive the loan documents for as long as ninety days, that she should be patient, and that a statement would be sent to her with a loan number. About thirty to forty days later, Ms. Russell alleges, she received the statement for payment; the statement included a monthly payment of $1,390.80. Ms. Powell assured Ms. Russell that this was a mistake that could be fixed. According to Ms. Russell, Household "representatives suggested that [she] pay the One Thousand Three Hundred Ninety Dollars and Eighty Cents ($1,390.80) per month payment and when she received copies of her closing documentation, that her overpayments would be applied and she would be ahead in her account." Ms. Russell alleges that she relied on these representations.

Despite the fact that Ms. Russell had bought insurance on the property as a precaution, Household charged her for its purchase of insurance on the property. Ms. Russell asserts that she made "good faith efforts of continuing to pay the monthly payment in the higher and incorrect amount of $1,390.80" and that Household representatives continued to cause her to "believe that they were 'in the process' of resolving the discrepancy over the payment." Ms. Russell further asserts that, on at least three occasions, Household suggested that she execute a forbearance agreement, but she refused because the proposed agreements "did not conform to the oral agreements made by telephone to which the forbearance agreements were to relate."

On or about March 25, 2004, Ms. Russell received notice of a substitute trustee sale of her property to occur in April 2004. She finally received a copy of all of the closing documentation from the closing in July 2000 on March 26, 2004. She alleges:

> Ms. Russell then saw, for the first time, that the documents executed by her at the closing in July of 2000 had been altered without her knowledge or consent. These documents include, but are not limited to, a Promissory Note (Ex. "G"), which increases the monthly payment by the amount of Five Hundred Dollars and Twenty Seven Cents ($500.27) and includes the interest rate of 12.350%. No interest rate was included in the original promissory note (attached to the complaint as Ex. B). The documents also included an altered Truth In Lending Disclosure Statement indicating a monthly payment allegedly owed by Ms. Russell in the amount of One Thousand Three Hundred Ninety dollars & Eighty Cents ($1,390.80) (Ex. "H") and a Monthly Payment Letter noting a payment due from Ms. Russell in the amount of One Thousand Three Hundred & Ninety Dollars, Eighty Cents ($1,390.80) (Ex. "I").

Ms. Russell further alleges that it was not until she received the closing documents that she became aware that Household had not, as she had been promised, paid off her second mortgage to AmSouth.

On April 8, 2004, Ms. Russell filed a Chapter 13 bankruptcy petition and, on September 3, 2004, she filed an adversarial proceeding against Household, SouthStar, and others in the bankruptcy court. These actions were eventually dismissed without prejudice. On June 23, 2006, a hearing was held in general sessions court on a detainer warrant filed by Household, and the court gave Household authority to take possession of Ms. Russell's house.

On July 14, 2006, Ms. Russell filed her original complaint in circuit court against Sellers Financial Group, LLC, SouthStar, Household, and Household Financial Services. The trial court granted the defendants' motion for summary judgment and, in the first appeal, this court affirmed regarding Ms. Russell's claim under the Consumer Protection Act, but reversed regarding all other claims. Ms. Russell's amended complaint includes claims for intentional misrepresentation, negligent misrepresentation, violation of the Truth in Lending Act, and common law fraud. HSBC[1] filed an answer and counterclaimed for breach of contract and unjust enrichment. The parties engaged in discovery, and there were numerous discovery disputes. The case was set for trial, and the trial was postponed several times.

*HSBC's motion for summary judgment*

On August 20, 2014, HSBC moved for summary judgment on all claims asserted by Ms. Russell and on its breach of contract counterclaim. HSBC argued that, "Notwithstanding Plaintiff's wholly unsubstantiated claims to the contrary, all of the documents in the record, however, plainly establish that the original lender for Plaintiff's loan was SouthStar Funding, LLC ("SouthStar"), and her mortgage broker was Sellers Financial Group, Inc." Therefore, HSBC asserted, it "could not have—and did not— make any representations at all to Plaintiff with respect to her loan before or during the closing." HSBC maintained that Ms. Russell could not establish the essential elements of her claims and that it was entitled to summary judgment. Because it was undisputed that Ms. Russell had defaulted on the loan, HSBC argued, it was entitled to summary judgment on its breach of contract counterclaim.

Along with its motion for summary judgment, HSBC submitted an affidavit of Dana St. Clair-Hougham, an HSBC employee, and a statement of undisputed material facts.[2] HSBC also submitted a list of documents, including Ms. Russell's deposition and

---

[1] At the time when Ms. Russell filed her original and amended complaints, she named Household Mortgage Services, Inc. and Household Financial Services, Inc. as defendants. These two entities are now known as HSBC Mortgage Services, Inc. ("HSBC"), which is the party involved in this appeal.

[2] The initial affidavit of Ms. St. Clair-Hougham that HSBC submitted with its motion for summary judgment was not signed or notarized, and Ms. Russell argues that the affidavit should be rejected for that reason. On August 28, 2014, however, well before the trial court's consideration of the

exhibits thereto, the affidavit of Brian Pitts with attachments, the affidavit of Tracy Hobby with attachments, and a Subordination of the AmSouth Deed of Trust.

Brian Pitts testified in his affidavit that he was the president of Sellers Financial Group, Inc. ("Sellers"), a mortgage brokerage firm, and was familiar with the records relating to the refinancing of a loan for Ms. Russell. He stated that Ms. Russell discussed refinancing her mortgage with a representative of Sellers on June 9, 2000 and signed a Broker Agreement for Financial Services including the terms of the services to be provided by Sellers. A copy of the broker agreement, signed by Ms. Russell and a representative of Sellers, was attached to Mr. Pitts's affidavit. The agreement is on a page with the name, address, and phone number of Sellers appearing prominently at the top. Pursuant to this agreement, Ms. Russell employed Sellers to "attempt to procure a mortgage loan based on the necessary information to be provided" by her.

Mr. Pitts's affidavit further states that Sellers's representative interviewed Ms. Russell on June 9 to complete the loan application, a copy of which is attached to the affidavit. It shows Ms. Russell's current principal and interest on her first mortgage was $774.00 per month; she also had other financial obligations totaling $601.00 per month. Also on June 9, Sellers provided Ms. Russell with a preliminary Truth-In-Lending disclosure statement, attached to Mr. Pitts's affidavit, which shows her estimated new monthly payments beginning August 1, 2000 to be $1,476.10. This document, too, purports to show Ms. Russell's signature, dated June 9. On June 13, according to Mr. Pitts and consistent with the attached document, Sellers provided Ms. Russell with a Good Faith Estimate of Settlement Costs, which she signed and dated that same day. The final document provided with Mr. Pitts's affidavit is a Uniform Residential Loan Application, which he asserts was updated with information provided by Ms. Russell and signed by her at the closing on July 21, 2000.

Tracy Hobby was employed as a closing agent by the Law Office of W. William Davis from April 2000 through March 2001. She testified in her affidavit that she was "familiar with office customs and practices" and that the fax machine "produced a fax legend on all incoming and outgoing faxes transmitted to and from the office." Ms. Hobby was a notary public for the closing on Ms. Russell's refinancing and stated that she "personally witnessed [Ms. Russell] execute the Loan Documents" attached to her affidavit.[3] According to Ms. Hobby, it was customary for the person closing on a loan to

motion for summary judgment on October 9, 2014, HSBC submitted a signed and notarized affidavit of Ms. St. Clair-Hougham. We, therefore, consider Ms. St. Clair-Hougham's signed and notarized affidavit proper.

[3] These attachments, purportedly executed by Ms. Russell on July 21, 2000 at the closing in Ms. Hobby's presence, are: a promissory note executed in favor of SouthStar, a deed of trust executed in favor of SouthStar, a notice of right to cancel, a Truth In Lending Disclosure Statement, a HUD-1

receive an "unsigned copy of all loan documents to review prior to executing the document." Ms. Hobby further averred that she "provided an unsigned copy of all loan documents to [Ms. Russell] to review prior to executing the document."

The Subordination of Deed of Trust dated July 14, 2000 is signed by an assistant vice president of AmSouth Bank. By signing this document, AmSouth agreed that the deed of trust executed to SouthStar on the property at issue (1206 Elliston Street, Old Hickory, Tennessee) in the amount of $131,750.00 on July 21, 2000 "shall be given the same effect as if it had been executed, delivered, and recorded prior to the deed of trust held by the undersigned." Thus, AmSouth agreed to subordinate its deed of trust to the deed of trust held by SouthStar on the property.

Also filed in support of HSBC's motion for summary judgment was the cover page and table of contents of a Bulk Continuing Loan Purchase Agreement between HSBC and SouthStar. HSBC later filed the entire agreement under seal. Pursuant to this agreement, executed on May 20, 1999, SouthStar offered groups of loans to HSBC for sale and HSBC would purchase them in accordance with the terms and conditions set forth in the agreement.

In the affidavit of Ms. St. Clair-Hougham filed on August 28, 2014, she testified that "the matters stated herein are personally known to me or based on my review of records related to Plaintiff Deborah Russell's loan and this case." She was a Vice President and Assistant Secretary of the Administrative Services Division at HSBC and provided services for the legal department and default services. Ms. St. Clair-Hougham stated that, on July 21, 2000, Ms. Russell executed a note in the amount of $131,750.00 in favor of SouthStar under which she was required to pay $1,390.80 per month. Furthermore, she asserted, later that month, "SouthStar sold a portfolio of loans to Household Financial Services, Inc. and its affiliates ("HFS") pursuant to a bulk loan purchase agreement between the foregoing entities. Plaintiff's loan was one of the loans included in this portfolio." Ms. St. Clair-Hougham stated that, "Neither HFS nor its affiliates had any role or involvement in the origination or closing of Plaintiff's loan in 2000." At closing, "SouthStar executed an allonge[4] to the Note in favor of HFS."

Ms. Clair-Houghman went on to aver that, "[a]t the time of the purchase [of the

Settlement Statement, a closing certification, a servicing disclosure statement, a nearest relative form, an address certification, an errors and omissions/compliance agreement, a hold harmless statement, and a name affidavit.

[4] An "allonge" is "[a] slip of paper sometimes attached to a negotiable instrument for the purpose of receiving further indorsements when the original paper is filled with indorsements." BLACK'S LAW DICTIONARY (10th ed. 2014).

loan from SouthStar], HFS had no notice or knowledge of any dispute with respect to the Note." In particular, she stated, "HFS had no notice or knowledge of any alteration(s), addition(s), deletion(s), or other change(s) allegedly made to the Note by SouthStar (or another third party) without Plaintiff's knowledge or consent at that time." The affidavit goes on to detail Ms. Russell's failure to make payments on the loan, Household's initiation of foreclosure proceedings, and its purchase of the property at the foreclosure auction. The proceeds of the auction did not satisfy the balance owed by Ms. Russell on the note.

*Ms. Russell's response to the motion for summary judgment*

Ms. Russell filed a response in opposition to HSBC's motion for summary judgment arguing that there were genuine issues of material fact regarding HSBC's fraudulent and negligent misrepresentations to Ms. Russell about her loan after the closing, that the note upon which HSBC relied could contain fraudulent alterations of the note that was faxed to Ms. Russell, and that Ms. St. Clair-Hougham's affidavit failed to meet the requirements of Tenn. R. Civ. P. 56.06 and did not establish that HSBC was entitled to summary judgment as a matter of law.

With her response to HSBC's motion for summary judgment, Ms. Russell submitted the following documents: excerpts of her own deposition, excerpts of the deposition of Ms. St. Clair-Hougham, excerpts of the deposition of Thomas Vastrick, and her affidavit dated September 22, 2014 with exhibits. In her September 22, 2014 affidavit, Ms. Russell incorporated an earlier affidavit dated March 5, 2007 providing "a true and accurate account of facts relating to my closing and my transactions with [HSBC]." This affidavit states, in pertinent part:

> 3. In June, 2000 I was solicited by Household Finance to refinance my home with them ("Household"). On June 9th, I visited the offices of Household to discuss the possibility of refinancing. I did not provide them information regarding my monthly payments obligations. I informed them that my monthly payment must not exceed $850.00 per month. The documents attached as exhibits to the Affidavit of Brian Pitts are not the documents I signed.
> 4. After the application process, I was told by Household employees, or someone representing themselves to be acting on behalf of Household, that my monthly payment would be $890.53 and that this included property taxes and homeowners insurance.
> 5. I did not know who Sellers or SouthStar were or how they were involved with my refinancing with Household.
> 6. On or about July 21, 2000, at the closing in connection with the refinancing of my home, I signed a Truth In Lending Disclosure Statement

and a Note that represented a monthly payment on my new loan to be $890.53. (A copy of these documents [is] attached hereto as Exhibit A and B, respectively). I did not sign any document that represented my payment to be $1,390.80 per month. Some of the blanks in the loan documents were not completed at the time I signed them. I was told not to worry because they would be filled in later when the information was provided by Sandy at the Household office.

7. At the closing I was not given a copy of the loan documents and paperwork that I signed. I was later faxed a copy of the Truth In Lending Disclosure Statement attached as Exhibit A and the Note attached as Exhibit B.

8. When I still had not received copies of my loan documentation almost a week after the closing, I began to call the offices of Household. I was told that I might not receive the documents for as long as ninety (90) days after closing and that it "was no big deal."

9. Approximately thirty (30) to forty (40) days after closing, I received a statement from Household that indicated my monthly payment was $1,390.80. I knew that this was a mistake and immediately contacted Household. Household employees acknowledged to me that it was a mistake.[5]

In her September 2014 affidavit, Ms. Russell added that, when she attended the closing on July 21, 2000, Ms. Hobby handled the closing. Ms. Hobby allegedly asked Ms. Russell to sign "a large number of documents, many of which were blank, and I did as I was instructed." According to Ms. Russell, "nothing was notarized in my presence." Ms. Russell's affidavit further states:

3. Many of the Loan Documents referred to in Ms. Hobby's Affidavit contained terms that were added after I signed them and outside of my presence. I did not sign a note that provided for a monthly payment of $1,390.80, nor would I have signed such a note. Of the other documents presented as Loan Documents attached to Defendants' Exhibit 5, the Deed of Trust; the Notice of Right to Cancel; and the Truth in Lending Disclosure Statement had information added to them after I signed them and outside of my presence. The HUD-1 Settlement Statement included in the Loan Documents was different from the one I signed and that was faxed to me on the day of the closing. I did sign the Closing Certification, the Servicing Disclosure Statement, the Nearest Relative Form and the Address Certification, but I do not believe those documents were dated when I signed them. The Errors and Omissions document was not dated or

---

[5] Two of the pages of the March 2007 affidavit are missing from the record.

notarized when I signed it. I was not given any monthly payments coupons at closing. *The application and closing documents I signed did not evidence Sellers or SouthStar when I signed them.*

4. Some thirty to forty days after my closing, I received from Household a statement for payment in the amount of $1,390,80. This was $500.27 more per month than the payment amount printed on the promissory note I had signed. I spoke with Janice Powell of Household and told her that the stated monthly payment was higher than what I had agreed to. Ms. Powell told me this was a mistake that would be corrected, even if Household had to refinance the transaction. I told Household representatives who were servicing my loan that I would not have made the loan, if I had been told that my payments were going to be $1,390.80 per month. I was told that I should make payments in the amount of $1,390.80, and when my account was corrected I would be paid ahead on my account. I relied on these statements.
. . .
6. I tried for years to obtain a copy of my loan packet from Household. I was not told that Household held a note bearing my signature that purported to require me to make mortgage payments of $1,390.80, nor was I told that Household intended to enforce such a claim against me. Included in the copy of my loan documents that I received from Household in March, 2004, was a document, Exhibit 3 hereto, indicating that my loan from AmSouth had been subordinated but not paid off . . . . I had not [been told] that my loan from AmSouth had been subordinated instead of being paid off. I did not learn any of these facts until I received a copy of my loan packet in March, 2004. If I had known these facts, I would not have agreed to make monthly payments of $1,390.80 as Household had requested. Instead, I would have exercised my right to rescind the refinance.

(Emphasis added).

Attached to Ms. Russell's affidavit was a letter dated January 29, 2004 to her from Ms. St. Clair-Hougham responding to a letter from Ms. Russell containing a proposal for terms of settlement and "dissolution of the property." HSBC declined Ms. Russell's proposal. Instead, Ms. St. Clair-Hougham provided Ms. Russell with a reinstatement letter showing the amounts required to bring her account current.

The excerpted portions of Ms. Russell's depositions include passages where she describes to opposing counsel what she recalls being on various documents when she signed them. She stated that she gave all of her original documents to the first attorney to represent her, Mr. DeSha, and he had refused to return them to her. Ms. Russell was given a copy of key documents during her deposition and was asked to go through and

- 9 -

circle anything that was not on the form when she signed it. On the Truth-In-Lending Disclosure Statement dated July 21, 2000, she circled all of the terms and the name of the lender. On the note, too, she circled all of the terms, including the interest rate and monthly payment.

In the excerpted portions of her deposition, Ms. St. Clair-Hougham testified that, based upon information she obtained from HSBC's computer system, Ms. Russell and Mr. Bowman[6] executed a loan transaction with SouthStar, and HSBC acquired the loan from SouthStar in August of 2000. She could not testify as to what, if any, information was provided to HSBC by SouthStar prior to the purchase of the loan or what HSBC paid for the loan.

Thomas Vastrick was a forensic document examiner hired by Ms. Russell to examine some of the loan documents to determine whether they had been altered after the closing. In the excerpts from his deposition, counsel for HSBC questioned Mr. Vastrick about what was designated as "Q-2" in his report, a "modified" version of the promissory note dated July 21, 2000, Exhibit 5, and the "original" note, Exhibit 6.[7] The deposition includes the following testimony:

> Q. I want to go through the same analysis between Exhibits 5 and 6. What are the differences?
> A. (Reviewing exhibits.) The amount entry on the last line of section 3.
> Q. In terms of the payment amount, the 1390.80?
> A. Yes.
> Q. And what was on Q-2, Exhibit 5, is 890.53, right?
> A. Yes.
> Q. Anything else?
> A. And the interest rate amount in section 2 is not on the copy.
> Q. Yes. It says 12.35 and then basically it's nothing on Exhibit 5, correct?
> A. Correct.
> Q. Which of these is the original or the first document?
> A. First document is the original.
> Q. Now marked as number 6?
> A. Now marked as number 6, yes.
> Q. And is number 5 a modification of number 6?
> A. Number 5 has two different entries on it than number 6.

---

[6] Mr. Bowman lived in the house with Ms. Russell.

[7] The documents designated with the letter "Q" (Exhibit 5) are those identified by Ms. Russell as containing the terms she was promised; she alleges that these documents were modified after she signed them. The documents designated with the letter "K" (Exhibit 6) are those relied upon by HSBC as the official closing documents.

Q. So 5 modified from 6?

A. I don't know whether 5's from 6 or 6 is from 5.

Q. But you do know that 6 is the original, correct?

A. Yes.

Q. How can you tell that?

A. It has the original ink initials on the first page and signature on the second page.

Q. All right. Did you have an original of what's Exhibit 5 or Q-2?

A. No.

Q. Did you ever see an original of that?

A. No.

Q. All right. So you can't tell that 5 is modified from 6?

A. No.

Q. As opposed to the other way around?

A. No. I don't have any forensic evidence to support either one. I'm not saying it's one way or the other. I'm just saying I can't tell.

Q. Is it possible that 6 is modified from 5?

A. Yes.

Q. But you've not seen an original 5, correct?

A. Correct. Well, the original of 5 is 6.

Q. Right. So 5 is modified from 6, isn't it?

A. Well, not necessarily.

Q. Why not?

A. Because I don't know—I have no idea—since I don't know the process, I'm dealing with copies in the area where both of them have been—where both of them differ. There's no way to determine forensically which one is the product of the alteration or both.

Q. But didn't you conclude in your report that Q-2, which is Exhibit 5, is a copy of K-1b?

A. Yes, it is.

Q. And not the other way around, right?

A. Correct.

Q. So Exhibit 5 is a copy of 6.

A. Yes.

Q. 6 is not a copy of 5.

A. Correct.

Q. But you can't tell which one is the more original document or the one prior in time?

A. Well, I can tell which one was prior in time, but I can't say whether it's a specific entry in that portion of it.

Q. Okay. Which one was prior in time?

A. Prior in time—you're going to get me mixed up on—6.

- 11 -

Q. How do you know that?

A. Because it has the original ink handwritten entries.

Q. How could Exhibit 5 have been modified? I mean, how would somebody have gone about that in terms of the blanks and so forth?

A. Something as simple as Wite-Out. Physical erasure, chemical erasure.

Q. Would you expect most people to be able to do that, have access to Wite-Out or a chemical eraser?

A. Yes.

Q. All right. So you still agree that K-1b, which is number 6 that we have here today, bears the original entries, and then Exhibit Q-2, which is 5, must have been copied from K-1b and not the other way around?

A. Yes.

Q. You stand by that?

A. Yes.

With her response to the motion for summary judgment, Ms. Russell also submitted her response to HSBC's statement of material facts. She objected to HSBC's statement that she executed certain documents submitted with HSBC's motion: With respect to the Truth-In-Lending Disclosure Statement dated June 9, 2000, she alleged that she signed it before the information appearing below her signature was added.[8] As to the Truth-In-Lending Disclosure Statement dated July 21, 2000, Ms. Russell stated that she signed the document when it was blank. Ms. Russell also disputed the HUD-1 statement, the closing certification, the errors and omissions compliance agreement (on the ground that she signed it, but it was not notarized in her presence), and the notice of right to cancel. Ms. Russell further disputed the statement that Ms. Hobby served as the notary public for the closing on July 21, 2000 and that she personally witnessed Ms. Russell execute the loan documents. According to Ms. Russell, the note that HSBC said that she signed was not the note that she signed; she also stated that the deed of trust referenced by HSBC did not correspond to the note she executed. For most of HSBC's statements of material fact, Ms. Russell gave a version of the following response:

> OBJECTION. The affidavit of Dana St. Clair-Hougham, upon which the Defendants [rely] in part to establish this asserted statement of fact, does not satisfy the requirements of TRCP 56.06, because the affidavit was not based upon personal knowledge of the affiant nor did the affiant declare herself to be or qualify herself to be a business records custodian of the records to which she referred. For further answer, the asserted statement of fact is DISPUTED. The asserted Note that the Defendants reference does not correspond to the Note the Plaintiff executed.

---

[8] Ms. Russell signed this document at the top of the page, so most of the information appears below her signature.

Finally, Ms. Russell disputed that she still owed money on the promissory note. She alleged that the note "was fraudulently altered and the Plaintiff was discharged from the obligation [HSBC] seeks to enforce."

*HSBC's reply*

In its reply in support of its motion for summary judgment, HSBC submitted additional documents, including a second supplemental affidavit of Ms. St. Clair-Hougham. The only difference between this affidavit and the affidavit submitted in support of HSBC's motion for summary judgment is two sentences:

> As a Vice President and Assistant Secretary, I am familiar with the books and records maintained in the ordinary course of business by HSBC Mortgage Services, Inc., as well as the other various HSBC-named entities. The testimony contained in this Affidavit is based on my review of the documents and records in Plaintiff [Deborah] Russell's loan file maintained by HSBC Mortgage Services, Inc. in the ordinary course of its business.

HSBC also submitted the Forensic Document Examination Report of Mr. Vastrick and a portion of his deposition. Four "questioned" documents were submitted to determine if they bore evidence of alteration. These were designated "Q-1" through "Q-4." For comparison purposes, four corresponding original documents were submitted, which were designated "K-1a" through "K-1d." Mr. Vastrick made the following findings in his report:

> Exhibit Q-1 [copy of a Truth-In-Lending Disclosure Statement] is a copy of Exhibit K-1a. The Amount of Payments column entries; the Loan Number entry and the lower Prepayment "X" entry have been changed on Exhibit Q-1. In addition, the Annual Percentage Rate entry, the Finance Charge entry, Interest Rate entry, and the Total of Payments entry on Exhibit Q-1 have been erased/obliterated. It is possible that the printed, "DANIEL S. BOWMAN" entry below the corresponding signature on Exhibit K-1a was added after the signature. It cannot be determined whether the handwritten July 21, 2000 date entries corresponding to the two signature entries were erased/obliterated from Exhibit Q-1 or added to Exhibit K-1a.

> Exhibit Q-2 [copy of a note] is a copy of Exhibit K-1b. The amount entry on the last line of Section 3 (Payments) has been changed on Exhibit Q-2. In addition, the interest rate amount in Section 2 (Interest) has been erased/obliterated.

It cannot be definitively determined that Exhibit Q-3 [copy of monthly payment letter] is copied from Exhibit K-1c. There is limited evidence to indicate that the Mortgage Amt. entry, the Principal and Interest entry, and the TOTAL MONTHLY PAYMENT entry on Q-3 have been erased/obliterated.

Page 2 of Exhibit Q-4 [copy of HUD-1 settlement statement] is a copy of page 2 of Exhibit K-1d. It cannot be determined as to whether page 1 of Exhibit Q-4 can be associated with page 1 of Exhibit K-1d.

In the portion of Mr. Vastrick's testimony excerpted by HSBC, he testified concerning Q-3, marked as Exhibit 7 in the deposition, and K-1c, Exhibit 8. Mr. Vastrick stated that there was evidence that these were "two different documents" because "[t]he signature doesn't match up." In comparing the two documents to another document containing an original signature, Mr. Vastrick concluded that Exhibit 8, K-1c, had an original signature on it.

HSBC also submitted two more affidavits. Charles Schmitt, Assistant Vice President and Manager of Recourse Operations for HSBC, testified that he had been employed by HSBC for nearly thirty-one years and was "familiar with the books and records maintained in the ordinary course of business by [HSBC]." He averred that his testimony was based upon his personal knowledge and his review of the documents and records in the case and upon his review of Ms. Russell's loan file. Mr. Schmitt reviewed the chronology of events regarding Ms. Russell's loan with SouthStar and HSBC's subsequent purchase of the loan. According to Mr. Schmitt, "In 2000, HFS did not originate any consumer loans, and it did not originate [Ms. Russell's] loan. HFS only purchased loans on the secondary market from certain lenders, one of whom was SouthStar." Mr. Schmitt further stated that no HSBC entity "had any role or involvement in the origination or closing of [Ms. Russell's] loan in 2000."

Mr. Schmitt further testified as follows:

11. None of the agents, employees, or representatives of SouthStar was ever authorized to act as an agent, employee, or representative of HFS or any Household entity, including Household Financial Center, Inc. Neither HFS nor any Household entity, including Household Financial Center, Inc, ever received notice of an agent, employee, or representative of SouthStar acting as an agent, employee, or representative of HFS or any Household entity, including Household Financial Center, Inc. before or during the year 2000.

12. None of the agents, employees, or representatives of Sellers Financial was ever authorized to act as an agent, employee, or representative of HFS

or any Household entity, including Household Financial Center, Inc. Neither HFS nor any Household entity, including Household Financial Center, Inc, ever received notice of an agent, employee, or representative of Sellers Financial acting as an agent, employee, or representative of HFS or any Household entity, including Household Financial Center, Inc. before or during the year 2000.

13. None of the agents, employees, or representatives of SouthStar or Sellers Financial was ever authorized to solicit customers, complete paperwork for borrowers, originate loans, or conduct any other business at the alleged Household Financial Center, Inc. location in Madison, Tennessee. Neither HFS nor any Household entity, including Household Financial Center, Inc, ever received notice of an agent, employee, or representative of SouthStar or Sellers Financial conducting any such activities at the foregoing location.

In his supplemental affidavit, Brian Pitts stated that Sellers Financial, a mortgage brokerage firm, solicited potential borrowers by mail and by telephone. Mr. Pitts further stated:

5. Once a borrower applied for a mortgage, a Sellers Financial representative would locate a lender who would loan the funds necessary for the borrower to obtain or refinance their mortgage.

6. One of the lenders with whom Sellers Financial worked was SouthStar Funding, LLC.

7. Sellers Financial never obtained funding for a residential mortgage loan from Household Financial Services, Inc. or any other Household entity, including Household Financial Center, Inc.

8. Sellers Financial never had a direct or indirect agreement or business relationship with Household Financial Services, Inc. or any other Household entity, including Household Financial Center, Inc.

9. Sellers Financial is not now, nor has it ever been, partially or fully owned by Household Financial Services or any Household entity, including Household Financial Center, Inc.

10. In June 2000, Sellers Financial assisted Deborah Russell with obtaining a refinance of her home mortgage and acted as her mortgage broker for that transaction.

. . .

13. Sellers Financial did not have any involvement with SouthStar's sale of Plaintiff's loan to Household Financial Services, Inc. in or about July 2000.

14. None of the agents, employees, or representatives of Sellers Financial was authorized by HFS or any Household entity, including Household Financial Center, Inc., to act as an agent, employee, or representative of

- 15 -

HFS or any Household entity, including Household Financial Center, Inc. None of the agents, employees, or representatives of Sellers Financial ever acted as, or represented himself or herself to be, an agent, employee, or representative of HFS or any Household entity, including Household Financial Center, Inc.

15. None of the agents, employees, or representatives of Sellers Financial was authorized by HFS or any Household entity, including Household Financial Center, Inc., to solicit customers, complete paperwork, originate loans, or conduct any other business at the alleged Household Financial Center, Inc. location in Madison, Tennessee. None of the agents, employees, or representatives of Sellers Financial engaged in such activities at the alleged Household Financial Center, Inc. location in Madison, Tennessee.

*Trial court's ruling on motion for summary judgment*

The trial court held a hearing on the defendants'[9] motions for summary judgment on October 9, 2014, found in favor of the defendants, and made oral findings of fact and conclusions of law. In an order entered on October 27, 2014, the trial court found that there were no genuine issues of material fact and that HSBC was entitled to judgment as a matter of law on all of Ms. Russell's claims and on its counterclaim. The trial court granted the defendants' motions for summary judgment. In its order, the trial court adopted and incorporated the findings of fact and conclusions of law from the October 9 hearing. (We will set forth those findings and conclusions as relevant to our discussion of the issues on appeal.) The issue of damages was reserved.

A hearing on damages was held on October 30, 2014, and the trial court entered an order on December 22, 2014 awarding HSBC a deficiency judgment in the amount of $35,278.22 and attorney fees totaling $150,000.00. This appeal followed.

Issues on appeal

Ms. Russell raises a number of issues on appeal. We summarize these issues as follows:

(1) Whether the trial court erred in finding that the affidavits relied upon by HSBC in its motion for summary judgment complied with Tenn. R. Civ. P. 56 and should be considered.

(2) Whether the trial court erred in abridging Ms. Russell's right to discovery regarding the extent of forgeries by HSBC's counsel.

---

[9] All of the defendants, including HSBC, filed motions for summary judgment.

- 16 -

(3) Whether the trial court erred in failing to find that Ms. Russell rescinded the note.

(4) Whether the trial court erred in granting summary judgment in favor of HSBC on Ms. Russell's claims for fraud and misrepresentation.

(5) Whether the trial court erred in granting summary judgment in favor of HSBC on Ms. Russell's claims for violation of the Truth in Lending Act.

(6) Whether the trial court erred in granting summary judgment in favor of HSBC on its counterclaim for breach of contract.

STANDARD OF REVIEW

Summary judgment is an appropriate way of resolving a lawsuit when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." TENN. R. CIV. P. 56.04. A trial court's ruling on a motion for summary judgment is reviewed de novo, with no presumption of correctness. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015).

Our Supreme Court has recently reviewed the standards that have guided the courts in deciding whether a party is entitled to summary judgment since 1971, when summary judgment first became available in Tennessee. *Rye*, 477 S.W.3d at 250-61. The Court focused on the most recent standard that was enunciated in *Hannan v. Alltel Publishing Co.*, 270 S.W.3d 1 (Tenn. 2008), and determined that it "is incompatible with the history and text of Tennessee Rule 56 and has functioned in practice to frustrate the purposes for which summary judgment was intended—a rapid and inexpensive means of resolving issues and cases about which there is no genuine issue regarding material facts." *Id.* at 261 (citing *Bowman v. Henard*, 547 S.W.2d 527, 529 (Tenn. 1977); *Evco Corp. v. Ross*, 528 S.W.2d 20, 24 (Tenn. 1975)). Concluding that the standard set forth in *Hannan* is "unworkable and inconsistent with the history and text of Tennessee Rule 56," the Court in *Rye* overruled *Hannan* and "fully embrace[d] the standards articulated in the *Celotex* trilogy." *Id.* at 264; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-27 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-52 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-88 (1986).

The *Rye* Court wrote:

Our overruling of *Hannan* means that in Tennessee, as in the federal system, when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the*

*summary judgment stage* is insufficient to establish the nonmoving party's claim or defense. We reiterate that a moving party seeking summary judgment by attacking the nonmoving party's evidence must do more than make a conclusory assertion that summary judgment is appropriate on this basis. Rather, Tennessee Rule 56.03 requires the moving party to support its motion with "a separate concise statement of material facts as to which the moving party contends there is no genuine issue for trial." Tenn. R. Civ. P. 56.03. . . . "[W]hen a motion for summary judgment is made [and] . . . supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" *at the summary judgment stage* "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,* 475 U.S. at 586, 106 S.Ct. 1348. The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party.

*Rye*, 477 S.W.3d at 264-65. The Court emphasized that "[t]he focus is on the evidence the nonmoving party comes forward with at the summary judgment stage, not on hypothetical evidence that theoretically could be adduced, despite the passage of discovery deadlines, at a future trial." *Id.* at 265.

The summary judgment standard announced in *Rye* has retrospective application. *See Rye*, 477 S.W.3d at 263 n.9; *Thomas v. Standard Fire Ins. Co.*, No. E2015-01224-COA-R3-CV, 2016 WL 638559, at *7 (Tenn. Ct. App. Feb. 17, 2016) (Swiney, C.J., concurring).

ANALYSIS

Fraudulent and negligent misrepresentation

To prove a claim of fraudulent or intentional misrepresentation, a plaintiff must establish the following elements:

1) the defendant made a representation of an existing or past fact; 2) the representation was false when made; 3) the representation was in regard to a material fact; 4) the false representation was made either knowingly or without belief in its truth or recklessly; 5) plaintiff reasonably relied on the misrepresented material fact; and 6) plaintiff suffered damage as a result of the misrepresentation.

- 18 -

*Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008) (quoting *Metro. Gov't of Nashville & Davidson Cnty. v. McKinney*, 852 S.W.2d 233, 237 (Tenn. Ct. App. 1992)). Negligent misrepresentation differs from intentional misrepresentation in the required intent: the plaintiff must show that the defendant "'did not exercise reasonable care in obtaining or communicating the information.'" *Id.* (quoting *Williams v. Berube & Assocs.*, 26 S.W.3d 640, 645 (Tenn. Ct. App. 2000)).

We agree with the trial court that there are two areas of potential liability for HSBC—the origination and closing of the loan, and HSBC's post-closing conduct and servicing of the loan.[10] We begin with the origination and closing of the loan. Under the *Rye* standard, HSBC was required to affirmatively negate an essential element of Ms. Russell's claim or demonstrate that her evidence at the summary judgment stage was not sufficient to establish her claim. *Rye*, 477 S.W.3d at 264. HSBC asserts that "there is absolutely no proof that HSBC made <u>any</u> representations at all to Appellant during her loan application, refinancing, or closing process." In support of this statement, HSBC points to all of the loan documents establishing SouthStar as the lender and Sellers Financial as the mortgage broker.

To survive a properly supported motion for summary judgment, the nonmoving party "must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party." *Id.* at 265. Ms. Russell came forward with the following pertinent evidence: her affidavits dated March 5, 2007 and September 22, 2014 describe how HSBC solicited her to refinance her mortgage, telling her that her monthly payment would be $890.53, and leading her to believe that she was entering into a mortgage with HSBC.[11] Ms. Russell testified that the documents she signed were not the same as those relied upon by HSBC. Moreover, Ms. Russell specifically states in her September 2014 affidavit: "The application and closing documents I signed did not evidence Sellers or SouthStar when I signed them."

---

[10] Out of "an abundance of caution," HSBC (and the trial court) addressed a possible claim for general negligence in the servicing of Ms. Russell's loan, even though such a claim was not pled in any of her complaints, and Tennessee law does not generally impose common law duties on financial institutions with respect to their customers or borrowers. *See Vaughter v. BAC Home Loans Serv., LP*, No. 3:11-CV-00776, 2012 WL 162398, at *4 (M.D. Tenn. Jan. 19, 2012). We do not consider it necessary to address this issue.

[11] While HSBC denies ever having an office at 2021 Gallatin Road as Ms. Russell alleges, she has attached to her deposition photographs of a Household office at the alleged location, a lease agreement signed by the Household vice president, listings for a Household office at that location from a telephone directory, and an affidavit from the Tennessee Department of Financial Institutions stating that a subsidiary of Household had a registered office at that location.

We believe that Ms. Russell's evidence is sufficient to establish the existence of a genuine issue of material fact for trial on her claims for fraudulent and negligent misrepresentation with respect to the loan origination and closing, namely whether HSBC was involved in the origination and/or closing of Ms. Russell's loan and made false representations to her.

As to Ms. Russell's claims for fraudulent or negligent misrepresentation related to HSBC's post-closing conduct and servicing of the loan, the trial court held that, based upon the evidence, Ms. Russell "suffered no detriment as a result of her purported reliance on the alleged misrepresentations of HSBC's employees." HSBC asserts that the evidence affirmatively negates the element of detrimental reliance. Its argument is based upon the timing of the alleged misrepresentations:

> By the time HSBC began servicing Appellant's loan, she had already executed the Note, which HSBC then purchased in good faith and for value. Thus, the subsequent misrepresentations that were made to Appellant during the servicing of her loan did not induce her to do anything and, furthermore, she could not legally void or rescind the Note she executed at closing once it was assigned to HSBC.

HSBC cites Tenn. Code Ann. § 47-3-407(c), part of the Uniform Commercial Code provisions regarding holders in due course, in support of the second sentence of its arguments quoted above. HSBC asserts that Ms. Russell cannot show that its purported failure to answer her inquiries or provide her with copies of loan documents caused an injury because, as a holder in due course, it was entitled to enforce the loan as written.

HSBC's status as a holder in due course requires that it purchased Ms. Russell's loan in good faith, for value, and without notice of various deficiencies or problems with the instrument, including that it had been altered. Tenn. Code Ann. § 47-3-302(a)(2). The evidence produced by Ms. Russell in response to HSBC's motion for summary judgment with respect to the origination of the loan, if taken as true, would give HSBC knowledge of the loan's history and would prevent it from being a holder in due course.

Thus, we find that the evidence presented by Ms. Russell is sufficient to create a genuine issue of material fact regarding the misrepresentation claims having to do with HSBC's post-closing actions and servicing of the loan.

### Truth In Lending Act

In her amended complaint, Ms. Russell alleges that HSBC violated the Truth In Lending Act ("TILA") as follows:

- 20 -

a. By failing to provide the required disclosures prior to consummation of the [t]ransaction in violation of 14 U.S.C. § 1631(b) and Regulation Z § 226.17(b).

b. By failing to make required disclosures clearly and conspicuously in writing in violation of 15 U.S.C. § 1631(a) and Regulation Z § 226.17(a).

c. By failing to properly identify property subject to a security interest in violation of 15 U.S.C. § 1638(a)(9) and Regulation Z § 226.17(m).

d. By failing to include the finance charge and certain charges imposed by Defendant payable by Plaintiff incident to the extension of credit as required by 15 U.S.C. § 1605 and Regulation Z § 226.4, thus improperly disclosing the finance charge in violation of 15 U.S.C. 1638(a)(3) and Regulation Z § 226.18(d).

The TILA code sections referenced by Ms. Russell require creditors to make certain mandatory disclosures. The statutory definition of a "creditor" provides, in pertinent part, as follows:

> The term "creditor" refers only to a person who both (1) regularly extends . . . consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction *is initially payable on the face of the evidence of indebtedness* or, if there is no such evidence of indebtedness, by agreement.

15 U.S.C. § 1602(g) (emphasis added). On the face of the indebtedness, HSBC was not the party to whom the loan was initially payable. Therefore, it does not qualify as a "creditor" within the meaning of TILA.

Ms. Russell also argues that she was unable to exercise her right to rescission under TILA due to HSBC's alleged post-closing conduct.[12] The trial court stated:

> Because Plaintiff challenges the affidavit of Tracy Hobby, who testified that she notarized Plaintiff's loan documents and provided Plaintiff with a copy of those documents on the closing date, there is a disputed issue of fact as to whether Plaintiff received a copy of her loan documents at the closing on July 21, 2000. However, there is no dispute that Plaintiff received a copy of her loan documents on March 26, 2004. The Court finds

---

[12] In making this argument, Ms. Russell conflates the statute of limitations and statute of repose with the right of rescission. We will address only the right of rescission.

that Plaintiff was required to take some steps upon receipt of those documents to try to invoke her right of rescission within the three day window under TILA,[13] and there is no objective evidence in the record from which a reasonable jury could conclude that she would have rescinded (or at least attempted to rescind) the loan but for HSBC's purported delay in sending her loan documents to her. *See Jenkins v. AKZO Noble Coatings, Inc.*, 35 Fed. Appx. 79, 86 (4th Cir. 2002).

We agree with the trial court's reasoning and, therefore, affirm the trial court's holding that there are no genuine issues of material fact regarding Ms. Russell's TILA claims and hold that HSBC was properly granted judgment in its favor on these claims.

In light of our resolution of the foregoing issues, the remaining issues are pretermitted.

CONCLUSION

We affirm the trial court's judgment with respect to the grant of summary judgment on Ms. Russell's claims under TILA. We reverse with respect to the grant of summary judgment on her claims for negligent and intentional misrepresentation, vacate with respect to the grant of summary judgment on HSBC's breach of contract counterclaim and the award of damages, and remand for further proceedings. Costs of this appeal shall be assessed against HSBC, and execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE

---

[13] Section 1635(a) of Title 15 of the United States Code states:

Except as otherwise provided in this section, in the case of any consumer credit transaction . . . in which a security interest, including any such interest arising by operation of law, is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction *until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing material disclosures required under this subchapter, whichever is later*, by notifying the creditor, in accordance with regulations of the Bureau, of his intention to do so.

(Emphasis added).